Filed 5/11/16

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NURUDEEN ABIODUN LAMEED,<br><br>    Defendant and Appellant. | H042399<br>(Santa Clara County<br>Super. Ct. No. C1483338) |

Defendant Nurudeen Abiodun Lameed was charged with domestic violence (Pen. Code,[1] § 273.5, sub. (a)) and other felony offenses. Six months later, the court declared a doubt as to his competence, suspended criminal proceedings, and ordered that he be evaluated by a neuropsychologist and a psychiatrist. Both experts reported that defendant was mentally incompetent to stand trial, that it was medically appropriate to treat defendant with antipsychotic medication, and that defendant did not have the capacity to make decisions about such medication. Based on the reports, the court declared defendant incompetent, committed him to the Department of State Hospitals, found he did not have the capacity to make decisions regarding antipsychotic medication, and ordered that the hospital could involuntarily administer antipsychotic medication.

Defendant challenges the trial court's order authorizing the involuntary administration of antipsychotic medication. He argues the order does not meet the constitutional requirements set forth in *Sell v. United States* (2003) 539 U.S. 166 (*Sell*) or

---

[1] Unless otherwise stated, all further statutory references are to the Penal Code.

the statutory requirements of section 1370, subdivision (a)(2)(B)(i)(III).  We conclude: (1) defendant's reliance on *Sell* is misplaced in this case; (2) the trial court relied on a different subdivision of section 1370—subdivision (a)(2)(B)(i)(I), not subdivision (a)(2)(B)(i)(III)—to impose the order for involuntary medication; and (3) substantial evidence supported the trial court's order under that subdivision.  We will affirm the order.

## FACTS

Defendant was born and raised in Nigeria.  He obtained a Bachelor of Science degree in computer science from the University of Ibadan in Nigeria in 1998.  From 2006 until 2013, he lived in Montreal, Canada, and attended McGill University, where he received a Master's Degree and a Ph.D. in computer science.  In November 2013, defendant got a job as a software engineer and moved to Santa Clara, California.  By 2014, defendant had been married for 12 years and had three children.  Defendant moved to California without his wife and children.

### *Prior Psychotic Episode*

On March 17, 2014, defendant called 911 " 'after having numerous paranoid delusions that [had] been going on for some time.' "  His delusions included believing his apartment was wired, people were tracking his movements and controlling him, and " 'forces were trying to manage [his] thoughts and behaviors.' "  The record also suggests that defendant complained of being suicidal.

Defendant ended up in the emergency room of El Camino Hospital, where he was diagnosed with "psychosis NOS" (not otherwise specified) and admitted for a 72-hour hold under Welfare and Institutions Code section 5150 on the grounds that he was "gravely disabled and [a] danger to self."  In the emergency room, defendant reported "feeling very isolated, depressed, and [having] some questionable auditory hallucinations."  Defendant told Dr. Evan Gardner he was "almost going to kill

2

[him]self." He stated that " ' "there is a conspiracy to feed me negative info" for the past two weeks.' " The detention report for the 72-hour hold noted that defendant had not slept in a week, had eaten only grapes in the previous two days, and had contemplated committing suicide by drinking laundry detergent. Defendant reported that his paranoid delusions did not " 'appear to be so new,' " and " 'may have been going on for many years.' " While in the hospital, defendant's paranoid delusions continued. He was " 'preoccupied with suspicions around manipulation and persecution.' " He said he did not realize how much his family reduced his work stress and expressed concerns he had been "labeled" by his coworkers.

At the time of his hospital admission, defendant was " 'unwilling to take antipsychotic medications,' " which medications Dr. Gardner opined would be " 'quite helpful to relieve him of the stress of his numerous delusions . . . .' " During his three-day hospital stay, defendant continued to refuse medications. He eventually agreed to try a medication called risperidone. He " 'reluctantly signed the consent form' " to take that medication, but never actually took it.

At the end of the 72-hour hold, the doctors concluded that defendant was no longer a danger to himself or others, or gravely disabled, and could no longer be held involuntarily. But Dr. Gardner nonetheless believed defendant required further treatment and reported that defendant had left the hospital "against medical advice."

Defendant later stated that after his March 2014 hospitalization, he spoke with his family and " 'was able to get uplifted.' " He arranged for his wife and children to move to Santa Clara at the end of March 2014. His wife later reported that they moved due to concerns about defendant's well-being.

### Events that Resulted in Criminal Charges

On May 12, 2014, at approximately 8:40 a.m., defendant started arguing with his wife. He locked himself and his wife in the master bedroom suite and assaulted her.

3

During the assault, defendant attempted to insert his penis into his wife's vagina against her will. He then used force to digitally penetrate his wife's vagina and anus. He grabbed and twisted one of her breasts. He pushed her onto the bathroom floor, causing her head to hit the toilet, and began to strangle her. Defendant laid on top of his wife, held her down, and used his foot to block the bathroom door. Defendant's wife called out and asked the children to call 911.

When police officers arrived, they had to force the bathroom door open. When the officers entered the bathroom, defendant looked at them and continued assaulting his wife. Defendant resisted the officers, so they used a taser to accomplish the arrest.

Defendant's wife told the officers defendant had been " 'acting extremely strange lately," with significant changes in behavior for two weeks prior to the assault. The night before the assault, defendant was up all night, pacing, saying he wanted to die, and "crying profusely." Defendant's wife reported that defendant was stressed at work and had been having financial problems for about a year. She stated that defendant had " ' "never laid a hand on her" in the past.' "

Defendant's wife complained of pain in her head, back, groin, and chest and was transported to a hospital for treatment. The couple's three children (ages nine, seven, and five) were taken into protective custody and dependency proceedings were filed as a result of the incident. In July 2014, the dependency proceedings were dismissed and defendant's wife and children returned to Canada.

***Psychiatric Treatment in Jail***

When defendant arrived at the jail, he was placed on a 72-hour hold (Welf. & Inst. Code, § 5150) and on suicide watch in the jail's psychiatric unit. The hold was extended by 14 days (Welf. & Inst. Code, § 5250) because defendant was found to be gravely disabled and a danger to himself. After that, defendant's involuntary status was changed to voluntary and his condition was again diagnosed as "psychosis NOS." On June 3,

4

2014, a temporary conservatorship was ordered on the grounds that defendant was "gravely disabled." Defendant was then placed in another housing unit.

When he was first incarcerated, the medical staff put defendant on antipsychotic medications—Ativan (2 milligrams every 6 hours) and Zyprexa (10 milligrams per day). In July 2014, defendant was "complaining of Zyprexa." The nature of the complaint is not described in the record. But after he complained, the dosage was increased to 15 milligrams per day and the staff added a new medication—diphenhydramine (50 milligrams every 6 hours). In September 2014, defendant refused antidepressant medication. While in jail, defendant took metformin for his diabetes. Defendant was taking these medications at the time of the court-ordered psychiatric evaluations in November and December 2014.

### PROCEDURAL HISTORY

In May 2014, the prosecution filed a complaint charging defendant with six felony counts: (1) assault with intent to commit a felony (§ 220); (2) false imprisonment (§§ 236, 237); (3) assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)); (4) inflicting corporal injury on his spouse (§ 273.5, sub. (a)); and (5) two counts of forcible sexual penetration (§ 289, subd. (a)(1)). The complaint also charged defendant with one misdemeanor count of resisting arrest (§ 148, subd. (a)(1)).

On October 27, 2014, the court declared a doubt as to defendant's mental competence, suspended the criminal proceedings, and certified the case to the general jurisdiction of the court to determine defendant's competence to stand trial.

On November 5, 2014, the court appointed neuropsychologist Brent Hughey, Ph.D., to evaluate whether: (1) defendant was mentally incompetent; (2) it was medically appropriate to treat him with antipsychotic medication; (3) defendant had the capacity to make decisions about such medications (§ 1370, subd. (a)(2)(B)(i)(I)); and (4) defendant presented a danger of inflicting harm on others (§ 1370, subdivisions (a)(2)(B)(i)(II)).

5

***Court-Ordered Evaluation by Dr. Hughey***

Dr. Hughey interviewed defendant on November 10, 2014. He also reviewed the police report, the disposition report from the dependency proceeding, and defendant's medical records from El Camino Hospital and the jail. Defendant initially denied any prior mental health history, but when prompted, he acknowledged the 72-hour hold at El Camino Hospital "for 'being depressed' " and " 'paranoid.' " He acknowledged that Dr. Gardner had wanted him to take medication, but stated, " 'in fact I do not need any medication.' " Defendant told Dr. Hughey he had refused medications (presumably while in jail), but also stated that he was on Zyprexa for " 'schizophrenia . . . my confusion, to think straight . . . .' "

During the interview, defendant was adequately groomed and dressed in jail attire. He spoke in a "very soft, quiet voice in a frequently mumbling and stilted manner." He had "considerable difficulty expressing himself with frequent thought blockage (e.g., hesitant speech with frequent pauses, incomplete sentences, and vague or nonresponses)." His speech was "frequently fragmented and disorganized." Defendant often "rambled off topic," exhibited a "markedly disorganized train of thought," and "was persistently evasive." He "minimized or overtly denied any past mental health history unless confronted by alternative information."

Dr. Hughey concluded defendant was "quite clearly mentally ill but [was] making unsuccessful attempts to present himself in a more favorable manner." He opined that defendant's refusal to take medications and his decision to leave the hospital against medical advice after the 72-hour hold in March 2014 "points to an untreated psychotic disorder." He added that the auditory hallucinations, paranoid delusions, and claims of being controlled by others suggest a schizophrenic disorder. He noted that defendant continued to exhibit "significant symptoms despite his extended time in custody with psychotropic medication management."

6

Dr. Hughey diagnosed "Psychosis NOS vs. . . . Schizophrenia, Paranoid Type." He opined that defendant's prognosis was guarded for both clinical and capacity issues and that defendant was mentally incompetent to stand trial. Although defendant demonstrated adequate understanding of the criminal proceedings, "his ability to assist counsel in a rational manner [was] markedly impaired." Dr. Hughey concluded that it was medically appropriate to treat defendant with antipsychotic medications since he continued to exhibit a psychotic disorder. He added that use of anti-anxiety medications such as Ativan may help reduce some of defendant's anxiety, which is an important factor in his decompensation. He stated that defendant "will continue to require conservatorship for medications as he does not perceive any mental illness or need to utilize psychotropic medication."

Dr. Hughey also opined that defendant did not have the capacity to make decisions about antipsychotic medication. He reasoned that defendant was "in frank denial over his obvious mental illness," showed poor reasoning in general, had little understanding of his mental illness, and did "not believe that any medications are necessary and those that have been provided may be for sleep only."

Finally, Dr. Hughey opined that defendant did not present a danger of inflicting harm on others. Dr. Hughey noted that although defendant had acted violently toward his wife, resisted the police officers, and exhibited unusual behavior upon his admission to the jail, he had not otherwise made active efforts to harm others or himself. Dr. Hughey recommended that defendant continue taking antipsychotic medication, opined that it is probable defendant would attempt to limit his use of medication, and suggested random blood testing to monitor defendant's medication levels.

*Court-Ordered Evaluation by Dr. Greene*

After receiving Dr. Hughey's report, the court appointed psychiatrist John Greene, M.D., to evaluate defendant. The court asked Dr. Greene to address the same four

questions it had asked Dr. Hughey. Dr. Greene evaluated defendant on December 5, 2014, and filed his report with the court on February 27, 2015. Dr. Greene relied in part on Dr. Hughey's report.

Defendant told Dr. Greene he had never suffered from a psychiatric illness, delusions, or hallucinations. He also told Dr. Greene he was depressed after he was arrested, but was not depressed at the time of the evaluation. He said he had been taking Zyprexa and it helped him to sleep. Dr. Greene stated that during the evaluation, defendant "expressed substantial impairment in insight to his symptoms of mental illness." Defendant said the reports of psychotic symptoms before and during the 72-hour hold at El Camino Hospital and at the time he assaulted his wife were not true, and that he did not suffer from a mental illness. But defendant was not able to provide an alternative explanation for the events described in the police report. He stated that although he had been given antipsychotic medication, he did not need to take it and does not suffer from psychotic thinking. Dr. Greene diagnosed "Psychotic Disorder Not Otherwise Specified."

Dr. Greene reported that defendant was mentally incompetent to stand trial because he was unable to assist his attorney in conducting a defense in a rational manner due to his psychotic disorder. He also concluded it was "medically appropriate to treat [] defendant with antipsychotic medication, given his current diagnosis and need for treatment," and that defendant did not have the capacity to make decisions about such medications. Dr. Greene based his conclusion on defendant's "presentation of not understanding that he suffers from mental illness, and that medication has minimized his symptoms and improved his overall functioning." Dr. Greene also opined that defendant did not present a danger of inflicting physical harm on others within the meaning of section 1370, subdivision (a)(2)(B)(i)(II).

### Hearing on Involuntary Administration of Antipsychotic Medication

On March 11, 2015, the court conducted a hearing on defendant's competency to stand trial and found that defendant was incompetent. The court then (1) referred the

case to South Bay Conditional Release Program (South Bay CONREP) for a recommendation on the appropriate treatment setting for defendant (§ 1370, subd. (a)(2)(A)); and (2) scheduled a hearing pursuant to section 1370, subdivision (a)(2)(B), on defendant's "capacity to make decisions regarding the administration of antipsychotic medications." South Bay CONREP recommended defendant be committed to the Department of State Hospitals.

Both parties filed briefs regarding the involuntary administration of antipsychotic medication. The prosecution argued that section 1370 provides three alternate means by which the court could order involuntary administration of antipsychotic medication, which are set forth in subdivisions (a)(2)(B)(i)(I) through (III) of the statute. The prosecution stated it was proceeding under subdivision (a)(2)(B)(i)(I), which applies when "the defendant lacks capacity to make decisions regarding antipsychotic medication," the defendant's mental disorder requires treatment with such medications, and it is "probable that serious harm to the physical or mental health of the [defendant] will result" if his or her mental disorder is not treated with antipsychotic medication. (§ 1370, subd. (a)(2)(B)(i)(I).)

Dr. Greene was the only witness at the hearing. Dr. Greene testified that his diagnosis was "psychotic disorder not otherwise specified," which is recognized by the Diagnostic and Statistical Manual of Mental Disorders as a diagnosis. It is used when the evaluator does not have evidence to confirm a more specific psychotic diagnosis like schizophrenia or bipolar disorder. (See also, American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (4th ed., Text Rev., 2000) p. 298.) Dr. Greene initially testified it was not clear what illness defendant was suffering from— whether it was a brief psychotic disorder, or schizophrenia, or bipolar disorder. Dr. Greene later ruled out a brief psychotic disorder since defendant had two psychotic episodes more than 60 days apart.

Dr. Greene testified that psychotic disorder NOS can be treated with antipsychotic medications—that is how he usually treats patients with delusions—and that it is medically appropriate to treat defendant with such medications. There are several

9

antipsychotic medication available and any one of them would be beneficial to defendant in reducing his delusions. Zyprexa, the antipsychotic defendant was taking in jail, is used for patients who suffer from delusions or bipolar disorder, or both. The usual dosage is 5 to 20 milligrams per day. Defendant was taking 15 milligrams per day while in jail.

Dr. Greene believes defendant's offenses were due to his psychotic disorder, which was untreated before he went to jail. Dr. Greene opined that if defendant is not treated with antipsychotic medication, he will become delusional again and exhibit further violent behavior related to his delusions. He based his opinion on the victim's report that defendant was not acting like himself for a day or two before his crimes and the fact that defendant's offenses involved violent conduct.

Dr. Greene testified that if defendant is not treated with antipsychotic medication, there is a risk he will decompensate and become gravely disabled. Dr. Greene based this testimony on the fact that defendant was suicidal when he called 911 in March 2014. Dr. Greene opined that if defendant is not treated with medication, he will have a recurrence of his delusions and symptoms, including suicidal ideation. Dr. Greene also stated that defendant cannot be relied on to take his medications voluntarily since he denied having a mental illness, said he never had delusions, said he never went to the hospital, refused medication at the hospital, left the hospital against the doctor's recommendation, claimed his wife's allegations were untrue, and said he did not need medication. Dr. Greene also opined that antipsychotic medication would help restore defendant's competence by addressing the delusions he reported in March and May of 2014 and would help him understand that the allegations and the police officers' report could be true.

Regarding side effects, Dr. Greene asked defendant whether he was having any problems on Zyprexa. Defendant said Zyprexa helped him fall asleep. Dr. Greene did not know whether defendant thought this was a beneficial effect since it is very difficult to sleep in jail. Dr. Greene also asked defendant whether the Zyprexa affected his diabetes. Defendant did not report any problems. Dr. Greene disagreed with the assertion that all antipsychotic medications affect diabetes and stated that a treating physician would monitor the effects of the medication with lab work. Dr. Greene did not

ask defendant about any other specific side effects defendant may have been experiencing.

*Trial Court's Order on Capacity to Make Decisions Regarding Medication*

On April 20, 2015, the court found "by clear and convincing evidence that defendant does not have the capacity to consent to antipsychotic medications, [his] mental disorder requires medical treatment with antipsychotic medication, and, if [his] mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the patient will result." The court also found "that sufficient evidence has been presented that the defendant is presently suffering adverse effects to his physical or mental health." Specifically, the court found "that [defendant's] inability to recognize his mental illness, his lack of insight into his actions and denial of past events are evidence of the adverse effects of his current illness." The court ordered that "defendant may be involuntarily medicated while in placement" pursuant to section 1370, subdivision (a)(2)(B)(i)(I).

One week later, on April 27, 2015, the court filed its order committing defendant to the Department of State Hospitals. The court ordered that defendant "may be involuntarily administered antipsychotic medication by the Department of State Hospitals in the dosage and frequency deemed necessary by the treatment staff." The court stated that its order shall expire in one year (on April 27, 2016), as required by section 1370, subdivision (a)(7). The court also ordered the Department of State Hospitals to report on defendant's progress with a "recommendation whether or not it is appropriate to continue involuntary medication" no later than June 19, 2015.[2]

---

[2] Section 1370 requires the medical director of the state hospital to make such a written report to the court within 90 days of commitment. (§ 1370, subd. (b)(1).) It is not clear why the court ordered the state hospital to report within 53 days in this case.

11

When the court issued its order of commitment, defendant made a motion to stay the order pending appeal, which the trial court denied. The court reasoned that defendant will receive better treatment at the state hospital than at the local jail and that it is in defendant's best interest and the court's interest to have his capacity restored forthwith.

**DISCUSSION**

## I. *Legal Principles Governing Involuntary Administration of Antipsychotic Drugs*

Since both parties rely on *Sell*, we begin with a brief discussion of the constitutional standards in *Sell*, which apply when the court orders involuntary medication with antipsychotic medication to render the defendant competent to stand trial. (*Sell*, *supra*, 539 U.S. at pp. 181-182.) We will then review the statutory requirements for involuntary administration of antipsychotic medication under section 1370.

### A. **Constitutional Requirements Under** *Sell v. United States*

The United States Supreme Court has recognized that "an individual has a 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.' [Citation.]" (*Sell*, *supra*, 539 U.S. at p. 178, quoting *Washington v. Harper* (1990) 494 U.S. 210, 221.) In *Sell*, the court held that the "Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial" if the court finds that four factors support such an order. (*Id.* at pp. 179-181.)

"First, a court must find that *important* governmental interests are at stake." (*Sell*, *supra*, 539 U.S. at p. 180, original italics.) The State's interest in bringing a person accused of a serious crime to trial is important, but the court must evaluate each case individually to determine whether there are facts that may lessen that importance. In

12

addition to its interest in timely prosecution, the State "has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one." (*Id.* at p. 180.) "Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, . . . ." (*Id.* at p. 181, original italics.) "Third, the court must conclude that involuntary medication is *necessary* to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results . . . [and] must consider less intrusive means of administering the drugs, . . . ." (*Ibid.*) And "[f]ourth, . . . the court must conclude that administration of the drugs is *medically appropriate,* i.e., in the patient's best medical interest in light of his [or her] medical condition." (*Ibid.*; see also *People v. O'Dell* (2005) 126 Cal.App.4th 562, 569 (*O'Dell*).)

Although constitutionally permitted, orders for involuntary medication with antipsychotic drugs are disfavored and should be issued only upon a compelling showing. (*Carter v. Superior Court* (2006) 141 Cal.App.4th 992, 1000 (*Carter*), citing *U.S. v. Rivera-Guerrero* (9th Cir. 2005) 426 F.3d 1130, 1137-1138 (*Rivera-Guerrero*).)

The *Sell* factors apply only when the purpose of involuntary medication is to render the defendant competent to stand trial. As the United States Supreme Court explained in *Sell*, the trial court need not consider the *Sell* factors "if forced medication is warranted for a *different* purpose," such as "the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk. [Citation.] There are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds before turning to the trial competence question." (*Sell*, *supra*, 539 U.S. at p. 182.) The

13

focus of the inquiry with respect to a request to administer antipsychotic medication for "trial competence purposes" is "upon such questions as: Why is it medically appropriate forcibly to administer antipsychotic drugs to an individual who (1) is *not* dangerous *and* (2) *is* competent to make up his own mind about treatment?" (*Id.* at p. 183, original italics.)

## B. Requirements under California Penal Code Section 1370

Under section 1370, after a defendant has been found incompetent to stand trial, the trial court must make three basic decisions. First, the court must determine the type of treatment setting to be ordered: (1) "a state hospital for the care and treatment of the mentally disordered," (2) a "public or private treatment facility, including a county jail treatment facility," (3) a "community-based residential treatment" facility, or (4) an outpatient program. (§ 1370, subds. (a)(1)(B)(i)-(iii), (a)(2)(A).) Second, the "court shall hear and determine whether the defendant lacks *capacity to make decisions* regarding the administration of antipsychotic medication." (§ 1370, subd. (a)(2)(B), italics added.) Third, if the court finds the defendant has the capacity to make decisions regarding antipsychotic medication, it must then determine whether the defendant *consents* to the use of such medication. (§ 1370, subd. (a)(2)(B)(iv)-(v).)[3]

The California Legislature amended section 1370 in 2004 to meet the constitutional standards set forth in *Sell* and added subdivisions (a)(2)(B) and (a)(2)(C),

_____

[3] *People v. Christiana* (2010) 190 Cal.App.4th 1040, 1049-1050 (*Christiana*) describes a different analytical framework under section 1370, which requires the court to determine whether the defendant *consents* to the administration of antipsychotic medication before addressing the question of *capacity* to consent. But section 1370 was amended in 2011, after *Christiana* was decided. (Stats. 2011, ch. 654, § 2.) Those amendments, which became operative on July 1, 2012 (Stats. 2011, ch. 654, § 2, subd. (i)), require the court to determine the defendant's *capacity* to make decisions regarding the administration of antipsychotic medication before considering whether the defendant *consents* to the use of such medication. (§ 1370, subds. (a)(2)(B)(i), (iv)-(v).)

which govern the administration of antipsychotic medication. (*O'Dell*, *supra*, 126 Cal.App.4th at p. 569; Stats. 2004, ch. 486, § 2, pp. 3994-3995.) In determining whether the defendant lacks capacity to make decisions regarding the administration of antipsychotic medication, the statute directs the trial court to determine whether any of three sets of "conditions" or "criteria" are true. (§ 1370, subd. (a)(2)(B)(ii).) For ease of reference, we shall refer to the three sets of conditions described in section 1370, subdivision (a)(2)(B)(i) as "prongs" of that subdivision.

Under the first prong (§ 1370, subd. (a)(2)(B)(i)(I)), the court must determine whether "[t]he defendant lacks capacity to make decisions regarding antipsychotic medication, the defendant's mental disorder requires medical treatment with antipsychotic medication, and, if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that *serious harm to the physical or mental health of the patient will result*." (Italics added.) "Probability of serious harm" to the defendant's health requires evidence that "the defendant is presently suffering adverse effects to his or her physical or mental health, or the defendant has previously suffered these effects as a result of a mental disorder and his or her condition is substantially deteriorating." (*Ibid.*) The fact that the defendant has been diagnosed with a mental disorder is insufficient alone to establish probability of serious harm to the defendant's health. (*Ibid.*)

Under the second prong (§ 1370, subd. (a)(2)(B)(i)(II)), the court must determine, in relevant part, whether the "defendant is a danger to others, in that the defendant . . . had inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another that resulted in his or her being taken into custody, and *the defendant presents,* as a result of mental disorder or mental defect, *a demonstrated danger of inflicting substantial physical harm on others*." (Italics added.) Demonstrated danger may be "based on an assessment of the defendant's present mental condition." The court may also consider the defendant's "past behavior . . . within six years prior to

15

the time the defendant last . . . inflicted, . . . substantial physical harm on another, and other relevant evidence." (*Ibid.*) The first two prongs correspond to the "alternative grounds" described in *Sell*, to which the *Sell* factors do not apply. (See *Sell*, *supra*, 539 U.S. at pp. 181-182.)

The third prong of section 1370, subdivision (a)(2)(B)(i) essentially tracks the *Sell* factors. (*O'Dell*, *supra*, 126 Cal.App.4th at p. 569.) Under the third prong (§ 1370, subd. (a)(2)(B)(i)(III)), the court must determine whether "[t]he people have charged the defendant with a serious crime against the person or property, involuntary administration of antipsychotic medication is substantially likely to render the defendant competent to stand trial, the medication is unlikely to have side effects that interfere with the defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner, less intrusive treatments are unlikely to have substantially the same results, and antipsychotic medication is in the patient's best medical interest in light of his or her medical condition."

"If the court finds any of the conditions described in [the three prongs of subdivision (a)(2)(B)(i)] to be true, the court shall issue an order authorizing involuntary administration of antipsychotic medication to the defendant when and as prescribed by the defendant's treating psychiatrist at any facility housing the defendant for purposes of this chapter."[4] (§ 1370, subd. subdivision (a)(2)(B)(ii).) The order shall be valid for no more than one year. (*Ibid.*) The court shall not order involuntary administration of antipsychotic medication under the third prong, unless it first rules out the first two prongs. (§ 1370, subd. (a)(2)(B)(ii); see also *Sell*, *supra*, 539 U.S. at pp. 182-183.)

---

[4] The phrase "this chapter" refers to Chapter 6 (entitled "Inquiry Into the Competence of the Defendant Before Trial or After Conviction") of Title 10 (entitled "Miscellaneous Proceedings") of Part 2 (entitled "Of Criminal Procedure") of the Penal Code.

## II. *Standard of Review*

We review the trial court's order authorizing the involuntary administration of antipsychotic medication to defendant for substantial evidence. (*O'Dell*, *supra*, 126 Cal.App.4th at p. 570.)

## III. *Analysis*

### A. The *Sell* factors and the third prong of section 1370, subdivision (a)(2)(B)(i)(III) do not apply in this case.

Defendant contends there is insufficient evidence to support the trial court's order permitting involuntary administration of antipsychotic medication under the standards set forth in *Sell* and the third prong of section 1370, subdivision (a)(2)(B)(i). Citing *Christiana*, *supra*, 190 Cal.App.4th at pages 1049 to 1052 and *O'Dell*, *supra*, 126 Cal.App.4th at page 571, defendant argues there is insufficient evidence of the specific type of medication to be administered, the specific dosages authorized, or the side effects of the antipsychotic medication, as required by *Sell* and the third prong of section 1370, subdivision (a)(2)(B)(i). But in this case, the prosecution proceeded under the first prong of section 1370, subdivision (a)(2)(B)(i), not the third prong. At the hearing, the prosecution also argued that the evidence supported an order under the second prong of the statute. But again, the court based its ruling on the first prong of the statute, not the second or third prong.

Defendant's reliance on *Christiana* and *O'Dell* is misplaced. Both of those cases recognize that the *Sell* factors and the third prong of section 1370, subdivision (a)(2)(B)(i) apply when the government orders involuntary medication of "a mentally ill criminal defendant in order to render him competent to stand trial" and do not apply "when the antipsychotic medication is proposed for a different purpose, i.e., related to a defendant's dangerousness or to his own interests where refusal to take the medication

17

puts his health gravely at risk." (*O'Dell, supra*, 126 Cal.App.4th at p. 569, citing *Sell, supra*, 539 U.S. at pp. 181-182; accord *Christiana, supra*, 190 Cal.App.4th at p. 1049, fn. 4.) *O'Dell* added that the court reviews the *Sell* factors "only if [the] defendant does not lack capacity to make decisions regarding antipsychotic medication and is not a danger to others." (*O'Dell*, at p. 570, fn. 3, citing the first two prongs of former § 1370, subd. (a)(2)(B)(ii).)

In this case, the court found that defendant lacked capacity to make decisions regarding antipsychotic medication under the first prong of section 1370, subdivision (a)(2)(B)(i), and that the use of such medication was proposed for a "different purpose"— one of the alternative grounds set forth in *Sell*. This case is distinguishable from both *O'Dell* and *Christiana* since neither of those cases involved an order for involuntary administration of antipsychotic medication under the first prong of the statute. (*O'Dell*, at p. 570, fn. 3 [no evidence the defendant lacked capacity to make decisions regarding antipsychotic medication or that he was a danger to others within the meaning of the first two prongs]; *Christiana*, at p. 1049, fn. 4 ["The People do not contend that involuntary medication is justified for those other purposes, and none of the medical experts expressed an opinion that those purposes applied to defendant"].)

### B. Substantial evidence supports the court's order.

We turn next to the question whether there was substantial evidence to support the court's order under the first prong. To order involuntary administration of antipsychotic medication under the first prong, a trial court must find the following three facts true: "The defendant lacks capacity to make decisions regarding antipsychotic medication, the defendant's mental disorder requires medical treatment with antipsychotic medication, and, if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the patient will result."

18

(§ 1370, subd. (a)(2)(B)(i)(I).)  We conclude there was substantial evidence to support the trial court's findings as to each of these facts.

First, there was substantial evidence that "defendant lack[ed] capacity to make decisions regarding antipsychotic medication."  (§ 1370, subd. (a)(2)(B)(i)(I).)  In March 2014, after experiencing delusions and a psychotic episode that resulted in a 72-hour hold at El Camino Hospital because he was suicidal, gravely disabled, and a danger to himself, defendant refused to take antipsychotic medication that Dr. Gardner opined would be helpful in relieving defendant's delusions.  After three days, defendant left the hospital, against medical advice, after the staff determined they could no longer hold him involuntarily.  In May 2014, after defendant assaulted his wife and was taken to jail, he was once again placed on a 72-hour psychiatric hold, which was extended by 14 days.  Later, a temporary conservatorship for medications was ordered, because defendant was deemed "gravely disabled."

In November 2014, defendant acknowledged that Dr. Gardner had wanted him to take antipsychotic medication, but he told Dr. Hughey:  "in fact I do not need any medication."  Dr. Hughey opined that defendant had an "untreated psychotic disorder," and that he did not have the capacity to make decisions about antipsychotic medication.  Dr. Hughey reasoned that defendant was "in frank denial over his obvious mental illness," showed poor reasoning in general, had little understanding of his mental illness, and did "not believe that any medications are necessary and those that have been provided may be for sleep only."  Although Dr. Hughey recommended defendant continue taking antipsychotic medication, he opined that it is probable defendant will attempt to limit his use of medication, and suggested random blood testing to monitor his medication levels.

When defendant saw Dr. Greene in December 2014, he "expressed substantial impairment in insight to his symptoms of mental illness."  Defendant said the reports of psychotic symptoms in March 2014 and at the time he assaulted his wife were not true,

and he did not suffer from a mental illness. He also told Dr. Greene that although he had been given antipsychotic medication, he did not need to take it and does not suffer from psychotic thinking. Dr. Greene concluded that defendant did not have the capacity to make decisions about antipsychotic medication based on defendant's "presentation of not understanding that he suffers from mental illness, and that medication has minimized his symptoms and improved his overall functioning."

Second, substantial evidence supported the trial court's finding that "defendant's mental disorder requires medical treatment with antipsychotic medication." (§ 1370, subd. (a)(2)(B)(i)(I).) There was no dispute as to defendant's diagnosis. Dr. Gardner at El Camino Hospital, the jail physicians, Dr. Hughey, and Dr. Greene all diagnosed "psychotic disorder NOS." Dr. Gardner recommended antipsychotic medication in March 2014, which defendant refused. The jail physicians administered antipsychotic medication. Dr. Hughey and Dr. Greene both concluded that it was medically appropriate to treat defendant with antipsychotic medication. Dr. Hughey stated that defendant "will continue to require conservatorship for medications as he does not perceive any mental illness or need to utilize psychotropic medication." Dr. Greene testified at the hearing that psychotic disorder NOS can be treated with antipsychotic medications—that is how he usually treats patients with delusions—and that it is medically appropriate to treat defendant with such medications. Dr. Greene also stated that if defendant is not treated with antipsychotic medication, he will have a recurrence of his delusions and symptoms (including suicidal ideation), he may exhibit further violent behavior related to his delusions, and there is a risk he will decompensate and become gravely disabled. Furthermore, there was no evidence that defendant did not require treatment with antipsychotic medication.

Third, there was substantial evidence that if "defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the patient will result." (§ 1370, subd. (a)(2)(B)(i)(I).) Section 1370,

20

subdivision (a)(2)(B)(i)(I) states: "Probability of serious harm to the physical or mental health of the defendant requires evidence that the defendant is presently suffering adverse effects to his or her physical or mental health, or the defendant has previously suffered these effects as a result of a mental disorder and his or her condition is substantially deteriorating. The fact that a defendant has a diagnosis of a mental disorder does not alone establish probability of serious harm to the physical or mental health of the defendant." Here, there was more than just a diagnosis of a mental disorder.

As the trial court found, there was ample evidence that defendant was "presently suffering adverse effects to his physical or mental health." Defendant's psychotic disorder was not treated before he went to jail. After being incarcerated, defendant was housed in a psychiatric or special unit of the jail, and he was taking antipsychotic medication. He initially required a 72-hour hold and suicide watch in jail because he was gravely disabled and a danger to himself. That hold was later extended by 14 days and then converted to a temporary conservatorship. Dr. Hughey opined that defendant "will continue to require conservatorship for medication as he does not perceive any mental illness or need to utilize psychotropic medication." He observed that defendant had considerable difficulty expressing himself, his speech and thought patterns were markedly disorganized, and he continued to exhibit "significant symptoms despite extended time in custody with psychotropic medication management." Both experts agreed that defendant was sufficiently mentally disabled that his ability to assist counsel in a rational manner was markedly impaired. And, as we have noted, Dr. Greene testified that if defendant is not treated with antipsychotic medication, he will have a recurrence of his delusions and symptoms (including suicidal ideation), may exhibit further violent behavior related to his delusions, and there is a risk he will decompensate and become gravely disabled. For these reasons, we conclude there was substantial evidence to support the trial court's order under the first prong of section 1370, subdivision (a)(2)(B)(i).

21

Defendant argues that the "time to consider issuing an order for involuntary medication is when or if, in [the] custodial setting [of the state hospital], appellant actually refuses to take his medication."  This argument ignores the express language of section 1370, subdivision (a)(2)(B), which directs the court, "[p]rior to making the order directing that the defendant be committed to the State Department of State Hospitals . . . ," to "hear and determine whether the defendant lacks capacity to make decisions regarding the administration of antipsychotic medication."  The statute provides that if the court finds any of the conditions described in the three prongs of subdivision (a)(2)(B)(i) of section 1370 to be true, it "shall issue an order authorizing involuntary administration of antipsychotic medication to the defendant when and as prescribed by the defendant's treating psychiatrist" at the facility where the defendant is to be housed. (§ 1370, subd. (a)(2)(B)(ii).)  We therefore reject this contention.

### DISPOSITION

The order for involuntary administration of antipsychotic medication in the state hospital is affirmed.

Márquez, J.

WE CONCUR:

Rushing, P.J.

Grover, J.

22

| | |
|---|---|
| Trial Court: | Santa Clara County<br>Superior Court No.: C1483338 |
| Trial Judge: | The Honorable Richard J. Loftus, Jr. |
| Attorney for Defendant and Appellant<br>Nurudeen A. Lameed: | Ozro William Childs<br>under appointment by the Court of<br>Appeal for Appellant |
| Attorneys for Plaintiff and Respondent<br>The People: | Kamala D. Harris,<br>Attorney General |
| | Gerald A. Engler,<br>Chief Assistant Attorney General |
| | Jeffrey M. Laurence,<br>Senior Assistant Attorney General |
| | Catherine A. Rivlin,<br>Supervising Deputy Attorney General |
| | Bruce M. Slavin,<br>Deputy Attorney General |