Filed 3/18/26  P. v. Stroh CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>THOMAS STROH,<br><br>Defendant and Appellant. | A173906<br><br>(Alameda County<br>Super. Ct. No. 21MH0147451) |

Thomas Stroh appeals from the trial court's grant of the People's petition for an order pursuant to Penal Code section 1370 to compel his involuntary treatment with antipsychotic medication.  He contends the order is not supported by substantial evidence.  We disagree and will affirm.

## I. BACKGROUND

In December 2021, the Alameda County District Attorney filed a felony complaint charging Stroh with unlawfully driving or taking a vehicle (Veh. Code, § 10851, subd. (a)) and assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)).

1

On March 19, 2025, defense counsel declared a doubt as to Stroh's competency to stand trial.[1]  The court suspended proceedings and ordered a psychiatric evaluation of his competency.  On May 2, 2025, the court found him incompetent to stand trial and subsequently ordered him committed to the Department of State Hospitals (DSH) for up to two years.

On June 27, 2025, DSH filed a petition in Alameda County Superior Court for an order pursuant to Penal Code section 1370 (section 1370) to compel Stroh's involuntary treatment with antipsychotic medication (petition).  The DSH attached two exhibits to its petition:  a June 23, 2025, 13-page certification report prepared pursuant to section 1370, subdivision (a)(2)(C) by Dr. Sarah J. Polfliet, which extensively reviews Stroh's mental disorder, symptoms, and behaviors, including a history of delusions and violence, his denial of his mental disorder and need for medication, and his need for medication; and a June 26, 2025 administrative law judge's order that Stroh could be involuntarily administered antipsychotic medication until July 14, 2025, later extended to July 17, 2025.

On July 17, 2025, the trial court held a hearing on DSH's petition.  The only evidence presented at the hearing was the testimony of Dr. Richard Cross.  Dr. Cross was a DSH staff psychiatrist working in the section 1370 restoration competency hearing unit who, since June 17, 2025—the date Stroh was transferred to his unit from Alameda County—was the

---

[1] The three-and-a-half year gap between the filing of the complaint and of defense counsel's declaration is perhaps explained by evidence presented at the hearing that we will soon discuss that Stroh had another case in San Mateo County for which he was hospitalized as incompetent to stand trial from August 15, 2023 to September 5, 2024.  At the end of that commitment he was found unlikely to regain competency.  Apparently, that case was dismissed and Stroh was then transferred to Alameda County for this case.

psychiatrist in charge of Stroh's case. He testified as an expert in the psychiatric treatment of mental illness.

On direct examination, Dr. Cross testified that Stroh's current psychiatric diagnosis was schizoaffective disorder bipolar type. According to Dr. Cross, Stroh's symptoms "are most notable for paranoid and possibly delusional belief systems. . . . He has been very paranoid. And when the symptoms get worse, he's had a history of acting out violently in defense of his system of beliefs." Stroh "is frequently in distress and fearful of the staff. In previous instances, he has been aggressive towards staff members. He has told us that the doctor who testified in a previous hearing perjured themselves and needs to be prosecuted for perjury." Dr. Cross further reported that "we haven't seen any overtly violent behavior since [Stroh's] admission here in the current episode that might be due to partial response to the probably inadequate amount of medication that he wasn't receiving under these current circumstances. We are grateful for that. But we are worried about the risks going forward."

Asked if Stroh was aware of his psychiatric condition, Dr. Cross said that Stroh had "stated many times that he does not have a mental health problem and is quite fearful of various medications. We are not able to discuss what appears to be his treatment history with medications . . . and he hasn't been cooperative with our recommendations." Stroh had told Dr. Cross "several times" that he did not have a mental illness.

Dr. Cross opined that Stroh did not have the capacity to make decisions about the administration of antipsychotic medication. Stroh was "unable to describe . . . a recognition of the condition and what treatment options are available and the pros and cons of each one, including the risks of no

3

treatment." Further, "[w]ithout treatment, his risk of disruptive or aggressive or violent behavior is quite elevated."

Dr. Cross further testified that untreated patients such as Stroh could engage in "[a]dditional episodes of behavior that could result in new criminal proceedings, injuries, inability to meet one's basic needs in the community, an inability to remain at liberty in the community without new encounters with the police, episodes of seclusion or restraints in treatment settings." Also, Dr. Cross, noting that Stroh had not been treated since the previous December, opined that the longer a person such as Stroh goes untreated, the lower the chances for a good outcome with treatment. Nonetheless, Dr. Cross said, Stroh "has a condition that we would expect would respond quite well to the treatment we're proposing."

Dr. Cross indicated that Stroh was resisting taking the presently prescribed medication, which consisted of two antipsychotic medications, quetiapine and Haldol, and a traditional medicine stabilizer, lithium. There were "several instances" where Stroh had to receive the "[involuntary medication] backup under the temporary involuntary medication order. He "typically sa[id] that a prior medication caused a side effect syndrome," but Dr. Cross was not able to discuss the details with him or compare Stroh's stated concern with his treatment records. Stroh preferred a particular medication that did not satisfactorily resolve his symptoms and he would not take any of the other medications that were needed to effectively treat him. Dr. Cross believed that Stroh would not take medication required for his treatment without an involuntary medication order.

On cross-examination, Dr. Cross was asked if there were "any symptoms or apparent conditions that you can specifically describe or worsening in [Stroh's] current commitment." He responded, "The falsely held

4

paranoid beliefs could get reinforced with more experience that confirms what he believes, which is that he is being mistreated by the treatment team, and the treatment team is not interested in helping him. This could further degrade his ability to form trusting treatment relationships with providers in the future." He also testified that Stroh's "condition has been improved because he's been at our very high level of care: Supervision and guidance, prompting for taking care of his basic needs, et cetera. I think if we were at liberty in the communities, his condition would be decidedly worse. So the treatment that he does receive on an involuntary basis, namely commitment to the state hospital, has helped him to improve. The skill of our staff ha[s] avoided any violent episodes so far. But I'm concerned that . . . we are still at risk from that."

On redirect, Dr. Cross testified that Stroh, despite showing "some improvement" while in DSH care, still required involuntary medication backups, was entirely uncooperative with medications as a critical element of his overall care, and was still experiencing persistent paranoia and delusional thoughts related to staff.

At the conclusion of the hearing, defense counsel argued there was not sufficient evidence of a probability of serious harm to Stroh's physical or mental health and, therefore, the court should deny the petition. The court then granted the petition, ordering involuntary medication of Stroh for up to one year. It stated, "Having considered all of the evidence and argument in this case, the Court finds by clear and convincing evidence that Mr. Stroh lacks the capacity to make decisions regarding antipsychotic medication; and if his mental disorder is not treated, serious harm to his physical or mental health is the probable result."

Stroh filed a timely notice of appeal.

## II. DISCUSSION

Stroh's sole argument on appeal is that Dr. Cross's testimony is insufficient to support the court's order. The People respond that Dr. Cross's testimony constitutes substantial evidence and, moreover, Dr. Polfliet's certification report, attached to the petition, buttresses the testimony. Stroh contends we cannot consider Dr. Polfliet's report because, although the People attached it as an exhibit to the petition, no one introduced it into evidence or referred to it at the hearing.

We conclude Dr. Cross's testimony constitutes substantial evidence adequate to support the trial court's order. We have no need to and do not further discuss Dr. Polfliet's certification report or the parties' debate over our authority to consider it as part of our evidentiary review.

### A. *Legal Standards*

As our colleagues in Division Two of this court recently wrote, " '[A]n individual has a "significant" constitutionally protected "liberty interest" in "avoiding the unwanted administration of antipsychotic drugs." ' (*Sell v. United States* (2003) 539 U.S. 166, 178 (*Sell*), quoting *Washington v. Harper* (1990) 494 U.S. 210, 221 (*Harper*).) The right is protected by the Fourteenth Amendment (*Sell, supra*, 539 U.S. at p. 178) and by the California Constitution and common law. (*In re Qawi* (2004) 32 Cal.4th 1, 14.)

"This right, however, is a qualified one. . . . [T]he government is permitted to administer antipsychotic drugs involuntarily 'to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.' (*Sell, supra*, 539 U.S. at p. 179.)

"In 2004, the California Legislature amended section 1370 to meet the constitutional standards set forth in *Sell* and added subdivisions (a)(2)(B) and (a)(2)(C), which govern the administration of antipsychotic medication to defendants found incompetent to stand trial (IST defendants)." (*People v. Lewis* (2025) 111 Cal.App.5th 1078, 1089–1090.)

Section 1370 allows a trial court to authorize involuntary administration of antipsychotic medication to a defendant who is found incompetent to stand trial in any of three circumstances. (§ 1370, subd. (a)(2)(B)(i)(I)–(III).) The trial court below made its finding under the first of these provisions. That provision states that such an order is authorized if, based upon the opinion of a qualified psychiatrist or psychologist, "the defendant lacks the capacity to make decisions regarding antipsychotic medication, the defendant's mental disorder requires medical treatment with antipsychotic medication, and, if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the defendant will result." (§ 1370, subd. (a)(2)(B)(i)(I); see *People v. Lameed* (2016) 247 Cal.App.4th 381, 396 (*Lameed*).)

"Probability of serious harm to the physical or mental health of the defendant requires evidence that the defendant is presently suffering adverse effects to their physical or mental health, or the defendant has previously suffered these effects as a result of a mental disorder and their condition is substantially deteriorating. The fact that a defendant has a diagnosis of a mental disorder does not alone establish probability of serious harm to the physical or mental health of the defendant." (§ 1370, subd. (a)(2)(B)(i)(I); see *Lameed, supra*, 247 Cal.App.4th at p. 396.)

7

Stroh argues that the trial court was required to find clear and convincing evidence in support of the issuance of an involuntary medication order. He does not cite, and we have not found, a case deciding the burden of proof required under section 1370, but Lanterman-Petris-Short Act conservatorship cases have applied the clear and convincing evidence standard in evaluating a conservatee's competence to give informed consent to medical treatment. (E.g., *Conservatorship of S.A.* (2020) 57 Cal.App.5th 48, 55–56.) The People do not address the issue. Faced with similar circumstances, the court in one of the cases cited by Stroh assumed without deciding that the burden of proof below was clear and convincing evidence. (See *People v. Garcia* (2024) 99 Cal.App.5th 1048, 1054, fn. 2.) We shall make the same assumption without deciding the issue.

On appeal, we must affirm a trial court's order authorizing an involuntary medication order if it is supported by substantial evidence. (*Lameed, supra*, 247 Cal.App.4th at p. 397.) Our Supreme Court has instructed that, in reviewing whether evidence sufficiently supports a clear and convincing evidence finding, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.) The *O.B.* court further instructed, "Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996.)

8

**B.** *Analysis*

Stroh does dispute that Dr. Cross's testimony provides substantial evidence sufficient to meet the first two prongs of the governing subdivision of section 1370, subdivision (a)(2)(B)(i)(I), i.e., that he lacks capacity to make decisions regarding antipsychotic medication and that his mental disorder requires medical treatment with antipsychotic medication. His challenge rests entirely on the contention that there is insufficient evidence of the third prong, that if his mental disorder is not treated with antipsychotic medication, it is probable that serious harm to his physical or mental health will result. More specifically, he argues that Dr. Cross's testimony does not meet the "probability of serious harm" standard stated in the subdivision because that testimony shows neither that he was "presently" suffering adverse effects to his physical or mental health nor that he had previously suffered those effects as a result of his mental disorder and was in a substantially deteriorating condition.

We disagree. Dr. Cross testified on direct examination that Stroh was presently suffering from paranoid and possibly delusional belief systems. He was "frequently" in distress and fearful of staff. He had a history of violently acting in defense of those systems when his symptoms became worse, and in the past had been aggressive towards staff members. Dr. Cross further indicated (albeit in somewhat garbled syntax) that Stroh had not acted violently since his current admission in part because, despite his denial of his mental disorder and resistance to medication, he was involuntarily receiving prescribed medication pursuant to the temporary involuntary medication order.[2]

_____

[2] Dr. Cross added on cross-examination that Stroh's paranoid beliefs could be reinforced if he continued to believe his treatment team was

9

Further, Dr. Cross said on direct examination, without medication, Stroh's mental health could dramatically deteriorate to the point that he engaged in additional episodes of behavior that could result in new criminal proceedings and injuries. If his "serious mental illness" went untreated, "biochemically there could be harm to the brain." Also, the longer Stroh went untreated, the lower the chances that treatment of him would result in a good outcome. In Dr. Cross's opinion, "[w]ithout treatment, [Stroh's] risk of disruptive or aggressive or violent behavior is quite elevated." A fair inference from this observation—which we may and will draw—is that there is a probability Stroh's demonstrated propensity to be aggressive and even violent will worsen if he is off his medication, and at the very least there is a probability of harm to his own brain if he goes untreated for a lengthy period.

This testimony more than satisfies the standard we are to apply here. That is, Dr. Cross's testimony—which Stroh did not and does not dispute factually—constitutes substantial evidence from which a reasonable fact finder could have found it highly probable that at the time of the hearing, Stroh was both suffering adverse effects to his mental health as a result of his mental disorder, had previously suffered those effects, and—but for involuntary medication—was in a deteriorated condition that would continue to deteriorate, thereby creating a "quite elevated" risk that he would engage in further violent episodes and have encounters with police. This is substantial evidence establishing the probability of serious harm to his physical and mental health if the court did not grant the People's petition.

Stroh, while he acknowledges much of Dr. Cross's testimony that we have just recounted, largely ignores it in his analysis. Instead, he leans into

---

mistreating him. According to Dr. Cross, that "could further degrade his ability to form trusting treatment relationships with providers in the future."

10

those parts of Dr. Cross's cross-examination answers to questions about Stroh's worsening conditions in which the doctor indicated that Stroh was improving and had not acted out violently, because of the high level of care he was receiving at DSH.

There are two problems with Stroh's argument. First, as we have discussed, Dr. Cross indicated on direct examination that Stroh's present condition was aided by the involuntary medication he was then receiving as part of his care; and indeed, as of the hearing, the record indicates DSH had been temporarily authorized to administer involuntary medication to him for a considerable period of time—about three weeks. Given that testimony, a reasonable fact finder could conclude that Dr. Cross's testimony on cross-examination about Stroh's improving condition, although he did not again refer to this medication, included the positive effects of it on Stroh. This supports the People's petition, not Stroh's opposition to it.

Second, even adopting for the sake of argument Stroh's characterization of Dr. Cross's cross-examination answers, Stroh nonetheless is asking that we give greater weight to those answers than to Dr. Cross's testimony on direct examination. That would be improper for us to do under the substantial evidence standard of review we are to apply here. Again, we "must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 996.) As we have discussed, Dr. Cross's testimony contains the necessary substantial evidence here.

Stroh also argues, again by leaning into his counsel's cross-examination, that Dr. Cross's opinion that Stroh would suffer more in the

11

future was merely a generic opinion that would apply to all defendants who suffered from a mental disorder, which is not sufficient proof of his future deterioration. Dr. Cross's testimony belies this argument. Again, among other things, he stated that "[w]ithout treatment, [Stroh's] risk of disruptive or aggressive or violent behavior is quite elevated."

In sum, Stroh's arguments about the insufficiency of Dr. Cross's testimony lack merit.

### III. DISPOSITION

The order appealed from is affirmed.

STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
MOORMAN, J.*

---

\* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.