Filed 6/11/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br>v.<br>RONALD DESHUNN LEWIS,<br><br>       Defendant and Appellant. | A171414<br><br>(Contra Costa County<br>Super. Ct. Nos. 01-23-01997, 01-24-01976)<br><br>**PUBLIC—REDACTED VERSION.  Redacts material from sealed record.  (Cal. Rules of Court, rules 8.45, 8.46(f)(1) & (2).)** |

    Defendant Ronald Deshunn Lewis was charged with two counts of assault, alleged to have violated his probation, and found mentally incompetent to stand trial.  The trial court, relying on a report from a psychologist, later committed defendant to the California Department of State Hospitals (Department) and authorized it to involuntarily administer antipsychotic medication pursuant to Penal Code section 1370, subdivision (a)(2)(B) (section 1370(a)(2)(B)).[1]  Defendant appeals, arguing the trial court violated his rights to due process and equal protection when it issued the

_____

[1]    Further undesignated statutory references are to the Penal Code.

involuntary medication order without first affording him an evidentiary hearing. We disagree, and therefore affirm.

## BACKGROUND[2]

### Original Charges and Competency Proceedings

On July 19, 2023, the Contra Costa County District Attorney filed in case number 01-23-01997 an information alleging defendant committed assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)) with an enhancement that he personally inflicted great bodily injury (§ 12022.7, subd. (a)).

On August 18, the trial court declared a doubt as to defendant's mental competence and suspended the criminal proceedings. (§ 1368.) Several days later, the court appointed three psychologists, including [REDACTED], to evaluate defendant's mental condition. (§ 1369.) On October 11, based on the evaluators' reports, the court found defendant incompetent to stand trial. On November 15, the court committed defendant to the Department.

### Restoration of Defendant's Competency, Plea, and Placement on Probation

One month later, the Department certified that defendant had regained mental competence. On March 13, 2024, the court approved the certificate and reinstated criminal proceedings.

On April 3, defendant pled no contest to the count of assault by means of force likely to produce great bodily injury in return for the dismissal of the great bodily injury enhancement. The court placed defendant on probation for a one-year term.

---

[2] This case involves material from a sealed record. In accordance with California Rules of Court, rule 8.46(f)(1) and (2), we have concurrently filed public (redacted) and sealed (unredacted) versions of this opinion. We hereby order the unredacted version of this opinion sealed.

**Petition to Revoke Probation and New Charges**

On May 13, the probation department filed a petition to revoke probation alleging defendant violated the terms of his probation by "committing assault with force likely to produce great bodily injury and child abuse with possible great bodily injury/death." It was alleged that defendant followed a father and his juvenile son in a parking lot and attacked them at random. Defendant approached the father from behind and struck him in the side of the head with a rock. He then approached the juvenile victim and also struck him with the rock. When the juvenile victim was on the ground, defendant stood over him and then struck him in the head with the rock multiple times. The juvenile victim sustained a severe laceration to his head.

On May 14, the district attorney filed a complaint in another case (no. 01-24-01976) charging defendant with assault with a deadly weapon (§ 245, subd. (a)(1)) (count 1)) and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)) (count 2). The complaint also alleged that defendant personally inflicted great bodily injury (§ 12022.7, subd. (e)) in the commission of both counts, and that he used a deadly weapon in the commission of count 2 (§ 12022, subd. (b)(1)). It was further alleged that defendant violated the terms of his probation in case no. 01-23-01997.

**Second Competency Proceedings**

On May 28, based upon defense counsel's representations, the court declared a doubt as to defendant's competence in both cases and suspended proceedings. (§ 1368.) On June 5, the court again appointed [REDACTED] to evaluate among other things whether: defendant was mentally competent; it was medically appropriate to treat him with antipsychotic medication; defendant had the capacity to make decisions about such medications (§ 1370(a)(2)(B)(i)(I)); and defendant presented a danger of inflicting harm on others (§ 1370(a)(2)(B)(i)(II)).

***Competency Evaluator's Report***

[REDACTED]

***Competency Hearing***

At a hearing on July 23, the parties submitted on the evaluator's report with respect to her competency determination. The court found defendant incompetent to stand trial and directed the Contra Costa Conditional Release Program (CONREP) to provide a recommendation regarding an appropriate placement. (§ 1370, subd. (a)(2)(A).) The court deferred the issue of antipsychotic medication to the next hearing.

***CONREP Placement Report***

[REDACTED]

***Hearing on Placement and Involuntary Medication***

At a hearing on August 13, the parties submitted on the CONREP report as to placement.

With regard to medication, defense counsel stated that defendant was "consenting to medications" and thus objected to any order authorizing administration of antipsychotic medication on an involuntary basis. Defense counsel "object[ed] to an involuntary medication order short of a full hearing where I'm entitled to cross-examine witnesses and confront them about statements that are in incident reports as well as in medical records and to ascertain both capacity and dangerousness and fl[e]sh that issue out for the Court so that there is a substantial finding." Counsel further "object[ed] that there's no opportunity for a hearing and that that would violate [defendant's] due process and equal protection rights."

The court noted it was familiar with defense counsel's arguments because it had addressed and ruled on similar arguments raised in another case, which involved a defendant found incompetent to stand trial who moved for a full evidentiary hearing on the issue of involuntary medication. The

court then stated it was "incorporating" by reference its written order denying the request for an evidentiary hearing in that case.[3]  In that order, the court noted that the motion "argue[d] that a full evidentiary hearing, requiring witnesses to testify and be cross-examined, is required whenever a court is to 'hear and determine' the question of capacity to consent to medication under § 1370(a)(2)(B)."  The court rejected the argument.  It explained: "This court reads § 1370(a)(2)(B) as instructing the court to hold a hearing at which the doctors' § 1369(a) reports, as well as any additional doctors' reports submitted by the parties, are taken into consideration by the court; the parties may make argument as well.  However, witnesses are not called to testify or be subject to cross-examination, unless the court orders otherwise."  The court went on to conclude that neither due process nor equal protection principles required the court to conduct an evidentiary hearing in all cases upon demand.

Consistent with that order, the court denied defendant's request for an evidentiary hearing in this case and took the matter under submission.

### *Order Authorizing Involuntary Administration of Antipsychotic Medication*

On August 13, the court issued an order committing defendant to the Department for a maximum term of two years.  It then noted that defendant "currently consents to the administration of antipsychotic medication," but that it would nonetheless "make the following findings pursuant to . . . section 1370(a)(2)(B)."  The court found:  "Based on the report of [REDACTED] . . . the defendant lacks capacity to make decisions regarding

---

[3]  We previously granted defendant's motion to augment the record to include the trial court's "Order Denying Request for Evidentiary Hearing" in *People v. Mondrell Butler* (Super. Ct. Contra Costa County, 2023, No. 04-22-01131).

antipsychotic medication, the defendant's mental disorder requires medical treatment with antipsychotic medication, and, if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the defendant will result." Additionally, the court found that "defendant is a danger to others." Therefore, the court authorized, "the administration of antipsychotic medication as needed, including on an involuntary basis, to be administered under the direction and supervision of a licensed psychiatrist."

Defendant appealed from the August 13 order.

## DISCUSSION

Defendant contends the trial court violated his rights to due process and equal protection under the law when it issued an involuntary medication order under section 1370(a)(2)(B) without first affording him an evidentiary hearing. Before we address these contentions, we give an overview of the law on the involuntary administration of antipsychotic medication.

### General Legal Background

"[A]n individual has a 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.' " (*Sell v. United States* (2003) 539 U.S. 166, 178 (*Sell*), quoting *Washington v. Harper* (1990) 494 U.S. 210, 221 (*Harper*).) The right is protected by the Fourteenth Amendment (*Sell, supra,* 539 U.S. at p. 178) and by the California Constitution and common law. (*In re Qawi* (2004) 32 Cal.4th 1, 14.)

This right, however, is a qualified one. State prison inmates may exercise this right unless "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." (*Harper, supra,* 494 U.S. 210, 227.) Pretrial detainees are entitled to at least the same protection. (*Riggins v. Nevada* (1992) 504 U.S. 127, 135.) Further, the government is

permitted to administer antipsychotic drugs involuntarily "to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." (*Sell*, *supra*, 539 U.S. at p. 179.)

In 2004, the California Legislature amended section 1370 to meet the constitutional standards set forth in *Sell* and added subdivisions (a)(2)(B) and (a)(2)(C), which govern the administration of antipsychotic medication to defendants found incompetent to stand trial (IST defendants). (See *People v. Lameed* (2016) 247 Cal.App.4th 381, 396 (*Lameed*).)

Section 1370(a)(2)(B) currently provides: "The court shall *hear and determine* whether the defendant lacks the capacity to make decisions regarding the administration of antipsychotic medication. The court shall consider opinions in the reports prepared pursuant to subdivision (b) of Section 1369,[4] as applicable to the issue of whether the defendant lacks the capacity to make decisions regarding the administration of antipsychotic medication, and shall proceed as follows." (§ 1370(a)(2)(B), italics added.) Section 1370(a)(2)(B)(i) then provides that "[t]he court shall *hear and determine*" whether any of the following three conditions in subclauses (I) to

---

[4]     Section 1369 sets for the procedures for determining a defendant's mental competence and in subdivision (b) states in relevant part: "A licensed psychologist or psychiatrist shall evaluate the defendant and submit a written report to the court. The report shall include the opinion of the expert regarding all of the following matters[,]" including "whether treatment with antipsychotic medication . . . is appropriate for the defendant." (§ 1369, subds. (b)(1), (b)(2)(A).)

(III) is true.  (Italics added.)

Under section 1370(a)(2)(B)(i)(I), the court must determine, "[b]ased upon the opinion of the psychiatrist or licensed psychologist offered to the court . . . , the defendant lacks capacity to make decisions regarding antipsychotic medication, the defendant's mental disorder requires medical treatment with antipsychotic medication, and, if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the [patient] will result."

Under section 1370(a)(2)(B)(i)(II)), the court must determine, "[b]ased upon the opinion of the psychiatrist or licensed psychologist offered to the court . . . , the defendant is a danger to others, in that the defendant . . . had inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another that resulted in the defendant being taken into custody, and the defendant presents, as a result of mental disorder or mental defect, a demonstrated danger of inflicting substantial physical harm on others."

The third subclause of section 1370(a)(2)(B)(i) essentially tracks the *Sell* factors, and requires the court to determine whether involuntary medication is substantially likely to render the defendant competent to stand trial.  (§ 1370(a)(2)(B)(i)(III); *Lameed, supra*, 247 Cal.App.4th at p. 397.)

As noted, the trial court found the first and second conditions to be true.  Where, as here, the court finds any of the three above conditions to be true, the court "shall issue" an order authorizing involuntary medication for a period of no more than one year.  (§§ 1370(a)(2)(B)(ii)(I)–(III), 1370(a)(2)(B)(iii), 1370(a)(7)(a); *Lameed, supra*, 247 Cal.App.4th at pp. 396–397.)

**Section 1370(a)(2)(B) Does Not Require an Evidentiary Hearing**

As an initial matter, we note defendant's two main headings in the argument section of his opening brief assert constitutional claims, but within his discussion of the due process issue, he appears to question whether the trial court correctly construed section 1370(a)(2)(B) as a matter of statutory interpretation. Specifically, he asserts that section 1370(a)(2)(B) should be interpreted in a manner similar to how courts have construed other statutes in other contexts—that is, as mandating an evidentiary hearing prior to the ultimate decision at issue. To the extent defendant raises a statutory interpretation claim, we review it de novo. (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.)

" ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning." ' " (*People v. Scott* (2014) 58 Cal.4th 1415, 1421.) Here, the trial court read the statute's directive that it "hear and determine" whether to authorize the involuntary administration of antipsychotic medications (§§ 1370(a)(2)(B), 1370(a)(2)(B)(i)) as not including any requirement of a formal evidentiary hearing. Defendant does not explicitly address the meaning of the actual words used in the statute, much less confront the trial court's interpretation of the plain language of the statute. Nor does defendant in his reply brief dispute the People's argument that the plain language of section 1370(a)(2)(B) indicates no legislative intent to require an evidentiary prior to authorizing involuntary administration of antipsychotic medication under section 1370(a)(2)(B). Not only does defendant not dispute that assertion, but he also suggests that the Legislature's intent is irrelevant, asserting "regardless of whether the Legislature intended to provide those protections" he seeks, the trial court

must still determine whether its procedures meet procedural due process requirements.

Our review of the parties' briefs confirms that defendant does not contest the trial court's and People's conclusion that section 1370(a)(2)(B), on its face, does not indicate the Legislature intended to mandate a formal evidentiary hearing. We treat defendant's failure to refute this conclusion as a concession of that conclusion. (See *Rudick v. State Board of Optometry* (2019) 41 Cal.App.5th 77, 89–90 [appellants made an implicit concession by "failing to respond in their reply brief to the [respondent's] argument on th[at] point"]; accord, *Ross v. Superior Court* (2022) 77 Cal.App.5th 667, 681.)

Perhaps recognizing that the plain language of section 1370(a)(2)(B) does not require an evidentiary hearing, defendant asks us to "look by analogy" to section 1203.2 (governing probation revocation proceedings) and Welfare and Institutions Code section 6602 (governing proceedings to determine if there is probable cause that an individual is a sexually violent predator (SVP) under the Sexually Violent Predators Act (SVPA; Welf. & Inst. Code, § 6600 et seq.).[5] Defendant argues that courts have construed these statutes "to require an evidentiary hearing." With regard to section

---

[5] Section 1203.2, subdivision (b)(1) provides in relevant part: "The court in the county in which the person is supervised has jurisdiction to *hear* the motion or petition [to revoke probation] . . . . After the receipt of a written report from the probation or parole officer, the court shall *read and consider the report* and either its motion or the petition and may modify, revoke, or terminate the supervision of the supervised person upon the grounds set forth in subdivision (a) if the interests of justice so require." (Italics added.) Welfare and Institutions Code section 6602, subdivision (a) provides that at a probable cause hearing the court "*shall review the petition and shall determine* whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (Italics added.)

10

1203.2, defendant adds that such a construction satisfied principles of due process. This argument lacks merit.

If the Legislature intended for procedures in the supervision revocation or SVPA context to apply to section 1370(a)(2)(B), it knows how to say so. (See, e.g., § 1026, subd. (c) [providing that the court, at a hearing in determining the propriety of a transfer of a defendant found not guilty by reason of insanity (NGI) between the Department and a public or private treatment facility, "shall use the same procedures and standards of proof as used in conducting probation revocation hearings pursuant to Section 1203.2."].) It did not use similar language in 1370(a)(2)(B).

To the extent defendant attempts to invoke the rule of statutory interpretation that courts should construe statutes to avoid constitutional infirmities, such rule is inapplicable. (See *Gilbert v. City of Sunnyvale* (2005) 130 Cal.App.4th 1264, 1285.) That rule does not come into play unless the statutory language is reasonably susceptible of two interpretations, one of which raises constitutional doubts. (*Ibid.*, citing *People v. Anderson* (1987) 43 Cal.3d 1104, 1146, superseded on other grounds as stated in *People v. Mil* (2012) 53 Cal.4th 400, 408–409; accord, *Johnson v. Arteaga-Martinez* (2022) 596 U.S. 573, 580 [" '[t]he canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." ' "].) But as discussed, defendant fails to establish that the text of section 1370(a)(2)(B) is reasonably susceptible to his interpretation.

We thus conclude the trial court correctly interpreted section 1370(a)(2)(B) as not requiring an evidentiary hearing prior to ordering involuntary administration of antipsychotic medications in all cases.

We thus turn to whether due process principles require such a hearing.

11

**Defendant Cannot Demonstrate a Due Process Violation**

*Due Process Principles*

We review defendant's due process claim de novo. (*People v. Marrero* (2021) 60 Cal.App.5th 896, 911.)

"The due process clauses of both the federal and state Constitutions forbid the state from depriving individuals of their liberty without due process of law. (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7, subd. (a).)" (*Camacho v. Superior Court* (2023) 15 Cal.5th 354, 379.) An individual bringing a due process claim must demonstrate: (1) a protected liberty or property interest and; (2) a lack of adequate procedural protections. (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 214 (*Today's Fresh Start*).) Here, there is no dispute that defendant "has a 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.' " (*Sell, supra,* 539 U.S. at p. 178, quoting *Harper, supra,* 494 U.S. at p. 221.) " ' "[T]he question remains what process is due." ' " (*Today's Fresh Start, supra,* 57 Cal.4th at p. 214.)

" '[D]ue process is the opportunity to be heard at a meaningful time and in a meaningful manner.' " (*Los Angeles Police Protective League v. City of Los Angeles* (2002) 102 Cal.App.4th 85, 91.) However, "[t]here is no presumption in favor of" holding an evidentiary hearing; the " 'judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances.' " (*Today's Fresh Start, supra,* 57 Cal.4th at p. 228, citing *Mathews v. Eldridge* (1976) 424 U.S. 319, 348 (*Mathews*); *Oberholzer v. Commission on Judicial Performance* (1999) 20 Cal.4th 371, 392 [" '[P]rocedural due process does not require a trial-type hearing in every instance.' "].

"[T]he procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the

particular case." (*Harper*, *supra*, 494 U.S. at 229.) "[D]ue process is flexible and calls for such procedural protections as the particular situation demands. . . . [N]ot all situations calling for procedural safeguards call for the same kind of procedure." (*Morrissey v. Brewer* (1972) 408 U.S. 471, 481 (*Morrissey*).) "[T]he extent to which due process relief will be available depends on a careful and clearly articulated balancing of the interests at stake in each context." (*People v. Ramirez* (1979) 25 Cal.3d 260, 268.) More specifically, to determine what process is due, courts apply the balancing test in *Mathews*, which weighs three factors: (1) the private interest that will be affected by the government action; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews*, *supra*, 424 U.S. at pp. 334–335; accord, *People v. Ramirez*, *supra*, 25 Cal.3d at p. 269.)

### *Analysis*

Defendant contends "the trial court violated [his] procedural due process rights under the Fourteenth Amendment by issuing an involuntary medication order after refusing to provide him with a full evidentiary hearing, including the right to cross-examine the competency evaluator and any hearsay declarants on whose statements the evaluator relied." Defendant then asserts that he was entitled to the "hearing rights articulated in *Harper* and *Morrissey*."

In *Harper*, the State of Washington confined Harper, a convicted felon, to a facility housing prisoners with serious mental illnesses and treated him with antipsychotic drugs against his will. (*Harper, supra*, 494 U.S. at p. 214.) The high court held that Washington's procedures for authorizing the

13

involuntary medication of inmates satisfied due process. (*Id.* at p. 228.) Those procedures included: notice; a hearing; a neutral and detached trier of fact, namely a hearing committee that included a non-treating psychiatrist, a psychologist, and a superintendent of the center at which inmates were treated for mental disorders; the inmate's right to be present at the adversarial hearing; the inmate's right to cross-examine witnesses; and the right to appeal. (*Id.* at pp. 228, 231, 235.) With respect to the hearing committee, the court rejected Harper's assertion that forcible medication decisions had to be made by judges rather than medical professionals. (*Id.* at pp. 229–231.) The court explained, "The risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals." (*Id.* at p. 233.) "A State may conclude with good reason that a judicial as administrative review using medical decisionmakers." " (*Ibid.*) The court added, " 'Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real.' " (*Id.* at p. 232.)

In *Morrissey*, the high court held that due process required the following procedures at a final parole revocation proceeding: "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as

to the evidence relied on and reasons for revoking parole." (*Morrissey*, *supra*, 408 U.S. at p. 489.) At the same time, *Morrissey* emphasized that "the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." (*Ibid.*)

Defendant contends that he was entitled to the same "hearing rights articulated in *Harper* and *Morrissey*" before going on to analyze the *Mathews* factors. Initially, we note defendant does not appear to argue that the trial court's denial of his request for an evidentiary hearing was per se unconstitutional under *Harper* or *Morrissey*. Instead, we understand his argument to be that based on his weighing of the *Mathews* factors, he was entitled to a *Harper*- or *Morrissey*-type of hearing that included the right to cross-examine the competency evaluator. In response, the People contend, as the trial court found, that the *Mathews* calculus comes out differently, weighing against an evidentiary hearing requirement. We agree with the trial court and the People.

As to the first *Mathews* factor—the private interest affected—there is no dispute that defendant's liberty interest in avoiding the unwanted administration of antipsychotic medication is "significant." (*Harper*, *supra*, 494 U.S. at p. 221.)

Under the second factor, we consider the risk of an erroneous deprivation of this interest through the procedures used by the trial court, and the probable value, if any, of additional or substitute procedural safeguards. (*Mathews*, *supra*, 424 U.S. at p. 334.) The trial court described the applicable procedures as follows: "As required by § 1370(a)(2)(B), this court's determination includes consideration of the reports prepared by licensed psychologists or psychiatrists, pursuant to § 1369(a). Under the

court's procedure, defendant is afforded the right to be present, represented by counsel, and to have counsel make argument. Furthermore, counsel is free to contact the evaluating physicians or independent physicians for additional information and reports, and provide such reports to be considered by this court at the hearing. And the court retains the authority to order live testimony and cross-examination where the court deems it necessary . . . ." The trial court then concluded that "[g]iven the requirement that the § 1370(a)(2)(B) determination be made in consideration of the report(s) submitted by the appointed experts, any risk of error in the lack of live testimony is minimal" and "[d]efendant fails to demonstrate why a determination made on the basis of written reports would be more erroneous than one made on an expert's live testimony." We agree.

*Mathews* itself is instructive on this point. There, the United States Supreme Court held due process did not require an evidentiary hearing prior to an administrative decision whether to terminate Social Security disability benefits and held that the administrative procedure in place was constitutionally sufficient. (*Mathews*, *supra*, 424 U.S. at pp. 340–347.)[6]

---

[6] That administrative procedure permitted a state agency to utilize a " 'team' " consisting of a physician and a disability evaluator to review a social security aid recipient's mental or physical impairment. (*Mathews*, *supra*, U.S. at pp. 336–337.) Once the state agency team concluded that the recipient had recovered, a recommendation was made to the Social Security Administration Bureau of Disability to terminate payments. Federal social security officials would then review the state team's disability benefits termination recommendation. The state team's termination decision was usually upheld by the social security officials. Two months later, payment of the recipient's social security disability benefits would terminate. The recipient could pursue a series of administrative reviews. But prior to the decision to terminate disability payments, there was no right to an evidentiary hearing. (*Id.* at p. 349.)

*Mathews* explained that "[t]he decision whether to discontinue disability benefits will turn, in most cases, upon 'routine, standard, and unbiased medical reports by physician specialists.' " (*Id.* at p. 344.) *Mathews* noted that the high court has "recognized the 'reliability and probative worth of written medical reports' emphasizing that while there may be 'professional disagreement with the medical conclusions' the 'specter of questionable credibility and veracity is not present.' " (*Id.* at pp. 344–345.) Further, where the proof is more amenable to written than oral presentation, such as proof derived from medical sources, the risk of error without oral testimony is diminished. (*Id.* at p. 345 ["the information critical to the entitlement decision usually is derived from medical sources, such as the treating physician. Such sources are likely to be able to communicate more effectively through written documents . . . "].)

These principles also apply to the decision whether to issue involuntary medication under section 1370(a)(2)(B). That decision, as the trial court noted, must be based on a consideration of a written report by a qualified mental health expert. (§ 1370(a)(2)(B).) The competency statutes envision a careful diagnostic evaluation by a licensed psychologist or psychiatrist and the submission of a report of that evaluation prior to a decision to order involuntary medication. (See §§ 1370(a)(2)(B), 1369, subd. (b).) To the extent such reports are based on the experts' professional conclusions and personal examination of the defendant, as in *Mathews*, the " 'specter of credibility and veracity is not present.' " (*Mathews*, *supra*, 424 U.S. at pp. 344–345.) Further, similar to the physician reports in *Mathews*, the conclusions and recommendations of the mental health experts on the appropriateness of antipsychotic medication are likely more amenable to written than oral presentation. (*Id.* at p. 345.)

This is not to suggest that the competency evaluators' opinions are infallible and impervious to attacks on grounds of credibility or veracity. But as *Mathews* noted, while "credibility and veracity may be a factor in the ultimate . . . assessment in some cases[,] . . . procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." (*Mathews*, *supra*, 424 U.S. at p. 344.)

Additionally, here, as in *Mathews*, "further safeguard[s] against mistake" include the trial court's procedure of granting the defendant and/or his or her attorney "full access to all information relied upon the state agency." (*Mathews*, *supra*, 424 U.S. at p. 346.) Specifically, as the trial court stated, "under [its] procedure," the defendant's attorney "is free to contact the evaluating physicians." Moreover, as in *Mathews*, "[o]pportunity is then afforded the [defendant] to submit additional evidence or arguments, enabling him to challenge directly the accuracy of information in his file as well as the correctness of the [psychologist's or psychiatrist's] conclusions." (*Ibid.*)

Further, while the court retains the discretion to conduct an evidentiary hearing for the parties to adduce live testimony or cross-examine witnesses where it finds such hearing warranted, such discretion, of course, must be reasoned and must reside within the confines of the applicable law. (See *People v. Johnson* (2022) 12 Cal.5th 544, 605–606 [" ' " [T]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . ." ' " '].)

Considering all of the above, we agree with the trial court and the People that the risk of an arbitrary or erroneous deprivation of defendant's protected interest through the trial court's procedures is slight.

Defendant, however, argues that "[v]esting the trial court with total discretion whether to allow cross-examination of the evaluator who authored the competency report, and the hearsay declarants on whom the author relied, increases the risk of an erroneous deprivation of [defendant's] protected interests." He then asserts that "cross-examination is an essential ingredient of due process," going on to explain that "in the *Morrissey* supervision revocation context, where the Sixth Amendment confrontation right does not apply, this Court 'has stated the opportunity of the accused to observe an adverse witness, while that witness testifies, is a significant aspect of the right of confrontation that may not be dispensed with lightly. [Citations omitted.] Indeed, the absence of proper confrontation at trial calls into question the ultimate integrity of the fact-finding process.' " (*People v. Shepherd* (2007) 151 Cal.App.4th 1193, 1199.) We are unpersuaded.

Other than citing general principles underlying the right of confrontation, defendant presents no cogent argument to support his conclusory claim that conferring the trial court with discretion over whether to allow live testimony and cross-examination "increases the risk of an erroneous deprivation of [his] protected interests." Additionally, although defendant relies heavily on procedures applicable in the supervision revocation context—where a limited right of confrontation has been recognized (see *People v. Johnson* (2004) 121 Cal.App.4th 1409, 1411)—he makes no attempt to articulate why the same procedures should extend to the particular context here. This is especially problematic when considering that *Morrissey* itself instructs that "due process is flexible and calls for such procedural protections as the *particular situation* demands." (*Morrissey*, *supra*, 408 U.S. at p. 481, italics added.) We decline to develop defendant's arguments for him. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194

Cal.App.4th 939, 956 [" 'We are not bound to develop appellant['s] arguments for [it]. [Citation.] The absence of cogent legal argument . . . allows this court to treat the contention as waived.' "]; accord, *People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1364, fn. 6.)[7] Accordingly, defendant fails to persuade us that the second *Mathews* factor weighs in favor of requiring an evidentiary hearing.

Turning to the third *Mathews* factor, we consider the public interest, including the fiscal and administrative burdens and societal costs that would be associated with requiring an evidentiary hearing upon demand in all case prior to the authorization of involuntary medication. (*Mathews*, *supra*, 424 U.S. at p. 347.) We agree with the trial court and the People that "mandating additional procedures like live witness testimony subject to cross-examination in every case" would impose significant burdens. The most visible burden would be the delays associated with requiring an evidentiary invariably in all cases. The logistics of holding an evidentiary hearing— including among other things subpoenaing documents and witnesses and

---

[7] Defendant apparently attempts to develop the point in his reply brief, citing to new authorities and asserting that "because of the inherent risk of an erroneous order due to the medical nature of the inquiry, requiring procedures similar to those in *Morrisey* is appropriate." This contention comes too late. (See *Bunzl Distribution USA, Inc. v. Franchise Tax Bd.* (2018) 27 Cal.App.5th 986, 998 [issue insufficiently raised in opening brief deemed forfeited, although it appeared in "slightly more developed form" in reply brief]; cf. *American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 276 ["Defendants may cite new authorities in support of arguments *properly raised* in the opening brief"], italics added].) Moreover, his claim that there is an "inherent risk of an erroneous order due to the medical nature of the inquiry" under section 1370(a)(2)(B) is itself conclusory. In any event, for the reasons discussed above, we disagree that the trial court's procedures present an "inherent risk" of an erroneous decision.

addressing legal or evidentiary issues in advance of and during the hearing itself—would require a considerable amount of time to accomplish.

And, as the trial court found, the delays associated with requiring an evidentiary hearing in all cases would in turn have potentially significant, adverse consequences. "The primary purpose of the pretrial confinement of incompetent defendants is neither punishment nor rehabilitation, but the restoration of that specific mental state without which the criminal process cannot proceed." (*People v. G.H.* (2014) 230 Cal.App.4th 1548, 1560.) "IST defendants' treatment must begin within a constitutionally reasonable period of time." (*Stiavetti v. Clendenin* (2021) 65 Cal.App.5th 691, 713, citing *Jackson v. Indiana* (1972) 406 U.S. 715, 738.) Moreover, the government has a "substantial interest in timely prosecution" of IST defendants. (*Sell, supra,* 539 U.S. at p. 180.) Requiring an evidentiary hearing upon demand in all cases prior to a determination under section 1370(a)(2)(B) runs the risk of violating an IST defendant's constitutional interest in timely treatment and evaluation, as well as the government's interest in timely prosecution.

Further, the delays associated with an evidentiary hearing requirement "not only risk potential harm to the IST defendant individually, but also risk potential harm to other patients." As the trial court explained, "The longer an IST individual remains untreated, the longer he may pose a threat to others at the hospital, or occupy a bed which could be opened for another defendant upon successful treatment. The delays caused by requiring evidentiary hearings may also lead to defendants spending more time in custody pre-commitment, given that § 1370(a)(2) requires the involuntary medication issue to be considered before the commitment order is made." And the court added, "Delay in treatment—especially where the only effective treatment is medication—is against the public interest.

Nor can it be ignored that the additional procedures would cause the parties, the courts, and witnesses to expend considerable resources.

Defendant's contrary arguments are unavailing. For example, he takes issue with the trial court's concern that conducting evidentiary hearings would cause delays, in part because of the time-intensive task of adhering to technical rules of evidence, including hearsay. He asserts that to alleviate this concern, the court could adopt the approach in the *Morrissey* context in which the rules of evidence do not apply "in full." But as explained above, defendant, without articulating a persuasive basis to do so, attempts to transmute the exceptional approach taken in *Morrissey* and supervision revocation cases into a standard applicable to IST defendants facing involuntary medication under section 1370(a)(2)(B). We decline defendant's invitation.

Likewise unconvincing is defendant's argument that "[t]here is also historical evidence that granting incompetent defendants the right to a *Morrissey*-type evidentiary hearing . . . would not present too great of a fiscal or administrative burden." Citing three cases as examples, defendant argues that "[t]here have been numerous published opinions over the past two decades examining the sufficiency of the evidence in support of an incompetency commitment involuntary medication order, and in many of them the person whom the state sought to forcibly medicate was afforded an adversarial evidentiary hearing at which the competency evaluator testified." This argument lacks merit. The fact that there have been several cases in which evidentiary hearings had been conducted hardly constitutes "historical evidence" to support the notion that requiring evidentiary hearings in all cases "would not present too great of a fiscal or administrative burden."

For all of these reasons, we agree with the trial court that the balance

of the *Mathews* factors "favors the public interest in an expeditious IST commitment process," and supports the conclusion "that due process does not mandate that a full evidentiary hearing under § 1370(a)(2)(B) is required in every case."

We next address defendant's claim in passing that "granting [him] and similarly situated individuals the right to present evidence and cross-examine adverse witnesses would also further 'the dignitary interest . . . in enabling them to present their side of the story before a responsible government official[.]' "  He goes on, "[t]aking away this right by virtue of a hearing lacking adequate procedural safeguards, including the right to cross-examination, would not accord sufficient respect to an incompetent defendant's dignity interests."  This argument assumes that the trial court's procedures pursuant to 1370(a)(2)(B) lack adequate procedural safeguards. For the reasons discussed, defendant has failed to support this assumption. To the contrary, the trial court's procedures afford IST defendants a meaningful opportunity to present their side of the story before the court determines whether to authorize involuntary medication.

In sum, defendant has failed to demonstrate the trial court violated due process in denying his request for an evidentiary hearing.

**Defendant Cannot Demonstrate an Equal Protection Violation**

Defendant next asserts that section 1370(a)(2)(B) violates his right to equal protection because it denies him the right to an evidentiary hearing prior to authorization of involuntary administration of antipsychotic medication that is afforded three other groups:  (1) other IST defendants subject to subparagraphs (C) and (D) of section 1370(a)(2) (section 1370(a)(2)(C) and (D)); (2) inmates in state prison and county jail subject to sections 2602 and 2603; and (3) individuals committed under "California's other civil commitment schemes."  We disagree.

### *Equal Protection Principles*

We review defendant's equal protection claim de novo. (*People v. Laird* (2018) 27 Cal.App.5th 458, 469.)

Both the federal and California Constitutions guarantee that no person shall be "den[ied] . . . the equal protection of the laws." (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.) "Equal protection of the laws means that similarly situated persons shall be treated similarly unless there is a sufficiently good reason to treat them differently." (*People v. Castel* (2017) 12 Cal.App.5th 1321, 1326 (*Castel*), citing *People v. Morales* (2016) 63 Cal.4th 399, 408; *Engquist v. Oregon Depart. of Agriculture* (2008) 553 U.S. 591, 602; *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.)

The first step in evaluating any equal protection claim is determining whether there are two groups of individuals who are " ' "similarly situated with respect to the legitimate purpose of the law" ' " but are being treated differently. (*People v. Barrett* (2012) 54 Cal.4th 1081, 1107 (*Barrett*).) "If the two groups are not similarly situated or are not being treated differently, then there can be no equal protection violation." (*Castel*, *supra*, 12 Cal.App.5th at p. 1326.) But "if these threshold requirements are met, a court must ascertain whether the Legislature has a constitutionally sufficient reason to treat the groups differently." (*Ibid*.)

### *Analysis*

#### **Whether similarly situated or treated differently**
#### *Other Civil Committees*

Looking to the first step of the equal protection analysis, defendant asserts that he is similarly situated to "individuals committed pursuant to the Lanterman-Petris-Short Act (LPS), the Sexually Violent Predator Act (SVPA), Offenders with Mental Health Disorders (OMHD's), [and] 1026 commitments (NGI)," since all groups "share the right to refuse medication

absent a judicial determination to the contrary." However, defendant claims that he is being treated differently from these groups because, unlike him, they are provided an evidentiary hearing.

Defendant fails to establish the premise of his argument that other civil committees are afforded an evidentiary hearing prior to a decision authorizing the involuntary administration of antipsychotic medication. Defendant does not point us to any specific statutes that he claims afforded other civil committees the evidentiary hearing that he was denied. Rather, his argument rests mainly on these two sentences from *State Department of State Hospitals v. J.W.* (2018) 31 Cal.App.5th 334, 347 (*State Department*): " 'To ensure the right to refuse medication is protected, a judicial determination of incapacity based on clear and convincing evidence following an evidentiary hearing is required before involuntary medication is permitted. (*Riese* [*v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d [1303,] 1322 [(*Riese*)].) This fundamental concept, equally recognized with respect to prisoners, [offenders with mental health disorders],[8] and SVPs in *In re Calhoun* [(2004) 121 Cal.App.4th 1315] and those that are mentally ill but not confined in *Riese*. . . [arises]. . . from the long-standing common law and statutory schemes discussed.' " Defendant's reliance on *State Department* is unavailing.

*State Department* addressed whether the trial court has authority to order involuntary medication for pretrial detainees who have been held upon probable cause but have not yet been committed as an SVP under the SVPA.

---

[8] Such prisoners were previously described as "mentally disordered offenders" or "MDOs." The Legislature changed this terminology to "offender with a mental health disorder" (OHMD). (*Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1095, fn. 3.)

(*State Department*, *supra*, 31 Cal.App.5th at pp. 337–338, 340–341.) The Court of Appeal answered yes, holding "the trial court has the discretionary authority under [Welfare and Institutions Code] section 6602.5 to order . . . involuntary medication upon a proper finding he is incompetent to refuse medical treatment." (*Id.* at pp. 347–348.) In reaching this conclusion, the court followed other cases that have held the court has authority to medicate individuals in other contexts, including persons found to be SVPs and committed to the state hospital, offenders with mental health disorders, and patients involuntary committed under the Lanterman-Petris-Short Act (LPS; Welf & Inst. Code, § 5000 et seq.) (*State Department*, at pp. 344–347). *State Department* explained that those cases recognized the individuals have the right to refuse medication, but that such right was "constrained," in that a court may order involuntary medication upon a finding that the individual is incompetent to make decisions about medical treatment. (*Id.* at p. 346, citing *In re Qawi*, *supra*, 32 Cal.4th at pp. 14–16; *In re Calhoun*, *supra*, 121 Cal.App.4th at p. 1350; *Riese*, *supra*, 209 Cal.App.3d at p. 1320.) It was within the context of this discussion recognizing the judicial authority to order involuntary medication that *State Hospitals* referenced the proposition in *Riese* that "[t]o ensure the right to refuse medication is protected, a judicial determination of incapacity based on clear and convincing evidence following an evidentiary hearing is required before involuntary medication is permitted." (*State Department*, *supra*, 31 Cal.App.5th at p. 346.)

As we read it, *State Department* addressed the *authority* of courts to order involuntary medication to pretrial detainees who have not yet been committed as a SVP; it did not purport to also decide the *procedures* that govern the exercise of that authority. " ' "It is axiomatic that cases are not authority for propositions not considered." ' " (*People v. Gray* (2023) 15

Cal.5th 152, 170, fn. 5.)  Thus, defendant's reliance on *State Department's* passing reference to the "evidentiary hearing" requirement is mistaken.

Further, to the extent *State Department* relied on *Riese* for the proposition that an evidentiary hearing is required before involuntary administration of antipsychotic medication is permitted, the trial court found that the Legislature made amendments to the Welfare and Institutions Code that call into question the viability of that proposition.  Specifically, the trial court explained:  "*Riese* noted that the convulsive therapy provisions in Welf. & Inst. Code § 5326.7 provided for an evidentiary hearing requirement, and held that the same procedures should apply to the determination of capacity to consent to antipsychotic medication.  (*Riese*, *supra*, 209 Cal.App.3d at 1322 ['Provisions of LPS governing the determination required when a patient's capacity to consent to convulsive therapy is called into question seem to us equally appropriate when the quest is capacity to consent to antipsychotic medication.']).  [¶]  However, the LPS Act was amended in 1991 by Senate Bill 665 (1991—1992 Reg. Sess.) to add explicit provisions for the administration of antipsychotic medication.  Welf. & Inst. Code § 5332 provides for the right to refuse treatment; §§ 5332—5334 provide the procedures by which medication may be administered, including where there has been a judicial determination of incapacity to consent.  Importantly, while the provisions provide regulations concerning timing, notice, location, and who may be the hearing officers, there are no provisions requiring that the hearing be an 'evidentiary' one with live testimony or cross-examination. As such, the provisions enacted by SB 665 can be read as implicitly abrogating *Riese* to the extent it applied the evidentiary hearing requirement found in Welf. & Inst. Code § 5326.7 to the subject of involuntary antipsychotic medication."

Defendant does not dispute the trial court's interpretation of the Legislative amendments, but argues that because *State Department*, which was decided after the amendments, cited *Riese* and mentioned the evidentiary hearing requirement, such a requirement survives the amendments. However, for the reasons explained above, defendant's reliance on *State Department* is unavailing.

Defendant thus has not established that individuals subject to section 1370(a)(2)(B), like himself, are treated differently than other civil committees. Consequently his equal protection claim with regard to individuals committed "under California's other civil commitment schemes" fails at the first step of the equal protection analysis. (See *Castel*, *supra*, 12 Cal.App.5th at p. 1326 ["If the two groups . . . are not being treated differently, then there can be no equal protection violation."].)

### *Inmates and Other IST Defendants*

We turn now to the two other classes that defendant seeks to be compared to: (1) inmates in county jail and prison subject to involuntary medication under sections 2602 and 2603 and (2) other IST defendants facing involuntary medication under section 1370(a)(2)(C) and (D).

With respect to the first class, the trial court found, and the parties agree, that those "imprisoned in the state prison and county jail are statutorily granted the right to refuse psychiatric medication" and "may [only] be involuntarily treated, but only after a hearing before a judge or court appointed official," which includes 'the right to present evidence, and the right to cross-examine witnesses." ' (§§ 2602(c)(7)(B); 2603(c).)"

The second class at issue are other IST defendants subject to involuntary medication under section 1370(a)(2)(C) and (D). Section 1370(a)(2)(C) provides in pertinent part: "If the defendant consented to antipsychotic medication . . ., but subsequently withdraws their consent, or, if

involuntary antipsychotic medication was not ordered pursuant to clause (v) of subparagraph (B), and the treating psychiatrist determines that antipsychotic medication has become medically necessary and appropriate, the treating psychiatrist shall make efforts to obtain informed consent from the defendant for antipsychotic medication.  If informed consent is not obtained from the defendant, and the treating psychiatrist is of the opinion that the defendant lacks the capacity to make decisions regarding antipsychotic medication . . . , the treating psychiatrist shall certify whether the lack of capacity and any applicable conditions described above exist. . . ."

Section 1370(a)(2)(D) provides in relevant part:  "(i) If the treating psychiatrist certifies that antipsychotic medication has become medically necessary and appropriate pursuant to subparagraph (C), antipsychotic medication may be administered to the defendant for not more than 21 days, provided, however, that, within 72 hours of the certification, the defendant is provided a medication review hearing before an administrative law judge to be conducted at the facility where the defendant is receiving treatment.  The treating psychiatrist shall present the case for the certification for involuntary treatment and the defendant shall be represented by an attorney or a patients' rights advocate. . . . The defendant shall also have the following rights with respect to the medication review hearing:  [¶] (I) To be given timely access to the defendant's records.  [¶]  (II) To be present at the hearing, unless the defendant waives that right.  [¶] (III) To present evidence at the hearing.  [¶] (IV) To question persons presenting evidence supporting involuntary medication.  [¶] (V) To make reasonable requests for attendance of witnesses on the defendant's behalf.  [¶] (VI)  To a hearing conducted in an impartial and informal manner.

". . . If the administrative law judge determines that the defendant

either meets the criteria specified in subclause (I) of clause (i) of subparagraph (B), or meets the criteria specified in subclause (II) of clause (i) of subparagraph (B), antipsychotic medication may continue to be administered to the defendant for the 21-day certification period." (§ 1370(a)(2)(D)(ii).) If the administrative law judge disagrees with the certification, "medication may not be administered involuntarily until the court determines that antipsychotic medication should be administered pursuant to this section." (§ 1370(a)(2)(D)(iii).) Section 1370(a)(2)(D)(iv) then directs that "[t]he court shall provide notice . . . and shall hold a hearing, no later than 18 days from the date of the certification, to determine whether antipsychotic medication should be ordered beyond the certification period."

We assume without deciding that individuals subject to involuntary medication under section 1370(a)(2)(B), like defendant, are similarly situated to, and are treated in an unequal manner from, both: (1) inmates subject to sections 2602 and 2603; and (2) individuals subject to section 1370(a)(2)(C) and (D).[9] Nonetheless, defendant cannot show an equal protection violation as to those two groups since we conclude there is a constitutionally sufficient

---

[9] As the trial court observed, "there is nothing in § 1370(a)(2)(D) that mandates a full evidentiary hearing in front of a superior court judge. At the first step, an administrative law judge conducts an impartial and informal hearing . . . . § 1370(a)(2)(D)(i). That is followed by a 'hearing' in superior court. [(§ 1370(a)(2)(D)(iv).)] At no stage of *this* process does the statute give the defendant the right to a formal evidentiary hearing, nor does the statute provide any sort of evidentiary hearing right in superior court." If IST defendants subject to section 1370(a)(2)(C) and (D) do not have the right to a hearing before a superior court judge, then, arguably, individuals subject to section 1370(a)(2)(B) like defendant are not being treated differently. However, we will assume for purposes of the appeal that the right at issue here is the right to an evidentiary hearing before a judge in general and regardless of the application of formal rules of evidence.

justification for the difference in treatment.

### Whether There is Sufficient Justification
#### *Standard of Scrutiny*

We first decide what standard applies to determining whether a constitutionally sufficient reason exists for the different treatment. Defendant contends the "strict scrutiny" standard applies, because a fundamental liberty is at stake. In contrast, the People advocate for the more deferential "rational basis" standard. We agree with the People that the rational basis standard applies here.

Defendant is correct that "California courts have historically used strict scrutiny in evaluating equal protection challenges based on differences among civil commitment schemes." (*People v. Morrison* (2025) 110 Cal.App.5th 702, 715 (*Morrison*).) "But simply asserting that a classification affects a 'liberty' interest proves too much. The California Supreme Court has cautioned against the application of strict scrutiny based solely on the rationale that ' "personal liberty is a fundamental interest.' " ' (*Morisson*, at p. 716, quoting *People v. Williams* (2024) 17 Cal.5th 99, 123.) *Morrison* went on to describe more recent case law considering the applicable standard of scrutiny to various equal protections challenges in the civil commitment context. (*Morrison*, at pp. 717 –718

In 2010, *People v. McKee* (2010) 47 Cal.4th 1172, 1202 (*McKee*) considered a challenge by an SVP to his indefinite commitment. The Supreme Court seems to have applied what purported to be a form of "heightened scrutiny" that appears to be less rigorous than strict scrutiny but more onerous than rational basis scrutiny. (*McKee, supra,* 47 Cal.4th at pp. 1206–1207, 1210–1211 & fns. 13 & 14.) *McKee* explained that it was not applying the "usual judicial deference to legislative findings" consonant with rational basis scrutiny (*id.* at p. 1206,), while simultaneously insisting that it

was also not applying strict scrutiny (*id.* at p. 1210, fn. 13). Although *McKee* ultimately remanded for the trial court to "apply[ ] the equal protection principles articulated in [*In re*] *Moye* [(1978) 22 Cal.3d 457 (*Moye*)] and related cases discussed in the present opinion" (*McKee*, at p. 1209)—and *Moye* applied strict scrutiny (*Moye, supra*, 22 Cal.3d at p. 465)—*Moye*'s application of that standard rested on a concession (*ibid.*) and, as noted, *McKee*'s discussion of related cases was not clear regarding which level of scrutiny to apply.

More recently, the Supreme Court in *Barrett* applied rational basis scrutiny to conclude that disparate treatment as to jury trial advisements for persons subject to commitment proceedings under Welfare and Institutions Code section 5300 et seq. (advisement required) and persons subject to LPS proceedings under Welfare and Institutions Code section 6500 et seq. (advisement not required) did not violate equal protection. (*Barrett, supra*, 54 Cal.4th at p. 1109–1111, fn. 21.) The court reasoned that "an equal protection violation does not occur merely because different statutory procedures have been included in different civil commitment schemes. [Citation.] Nothing compels the state 'to choose between attacking every aspect of a problem or not attacking the problem at all.' [Citation.] Far from having to 'solve all related ills at once' [citation], the Legislature has 'broad discretion' to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination." (*Barrett*, at p. 1110.)

As explained in *Morrison*, "In deciding what level of scrutiny to apply to equal protection claims involving nuanced details of civil commitment procedures, recent decisions of the Courts of Appeal have followed *Barrett* and applied rational basis review." (*Morrison, supra*, 110 Cal.App.5th at p.

718; see e.g., *People v. Nolasco* (2021) 67 Cal.App.5th 209, 226 (*Nolasco*) [examining timing renewals for individuals declared dangerous because of a " 'developmental disability' " or " 'mental disease, defect, or disorder' " ]; *People v. Magana* (2022) 76 Cal.App.5th 310, 324 (*Magana*) [following *Barrett* and concluding rational basis applied to challenge based on the SVPA's failure to require a personal jury trial advisement and waiver, unlike statutes governing trials for other civil commitments]; *Morrison*, at p.718] ["We agree with [*Nolasco*'s and *Magana*'s] application of the California Supreme Court precedent" and "decide rational basis review applies to Morrison's assertion that his equal protection rights were violated by the SVPA's failure to require a personal jury trial advisement and waiver."].)[10]

The People rely on *Magana*, one of the recent cases above that "have considered equal protection challenges to civil commitment statutes relating, as here, to secondary or ancillary trial procedures that do not necessary impact the individual's fundamental rights" and, therefore, have applied rational basis review. (See *Cannon*, *supra*, 85 Cal.App.5th at p. 797, citing *Magana*, *supra*, 76 Cal.App.5th at p. 324 [" 'Although the indefinite commitment of an alleged SVP affects the individual's fundamental right to

---

[10] In *Conservatorship of Eric B.*, our Supreme Court noted that appellate courts have reached different conclusions on the appropriate level of scrutiny for evaluating claims of disparate treatment in civil commitments, but it left resolution of the issue for another day. (*Conservatorship of Eric B.*, *supra*, 12 Cal.5th at pp. 1107–1108, citing *Nolasco*, *supra*, 67 Cal.App.5th at p. 225 and *People v. Flint* (2018) 22 Cal.App.5th 983, 992–993.) *In People v. Cannon* (2022) 85 Cal.App.5th 786, 798–799, our colleagues in Division Five followed *Nolasco* and *Magana* in concluding rational basis review applied in determining whether the SVPA violates equal protection by not requiring a personal waiver of a jury trial right, as other civil commitment statutes require. Our Supreme Court has granted review in *People v. Cannon*. (*People v. Cannon*, review granted Feb. 15, 2023, S277995.)

liberty, ensuring an alleged SVP has meaningful access to the statutory right to a jury trial, while essential to the exercise of that right, does not affect a fundamental right' "].) The People contend that "the same reasoning holds true for [defendant's] claim about hearing procedures for involuntary medication orders. It involves a challenge to the process surrounding the right to refuse, not the fundamental right to refuse medication itself."

The People's argument is well taken. For that reason, as well as the fact that "*Barrett* is the more recent pronouncement by our Supreme Court as to the pertinent level of scrutiny to apply when comparing divergent civil commitment procedures" (*Nolasco*, *supra*, 67 Cal.App.5th at p. 225), we also "choose to follow *Barrett*—and hence to apply rational basis scrutiny." (*Nolasco*, at p. 225.)

The rational basis test "sets a high bar" for litigants challenging legislative enactments. (*People v. Chatman* (2018) 4 Cal.5th 277, 289.) Under the rational basis test, "the legislation survives constitutional scrutiny as long as there is ' "any reasonably conceivable state of facts that could provide a rational basis for the classification." ' " (*People v. Turnage* (2012) 55 Cal.4th 62, 74.) "[A] court may engage in ' "rational speculation" ' as to the justifications for the legislative choice. [Citation.] It is immaterial for rational basis review 'whether or not' any such speculation has "a foundation in the record." (*Id.* at p. 75.) "Nor does the logic behind a potential justification need to be persuasive or sensible—rather than simply rational." (*People v. Chatman, supra,* 4 Cal.5th at p. 289.) The challenger bears the burden to " ' "negative every conceivable basis' " that might support the disputed statutory disparity." (*Johnson v. Department of Justice, supra,* 60 Cal.4th at p.881.) Defendant cannot meet this high bar.

### *Inmates*

We can ascertain a rational reason for why the Legislature would

require providing an evidentiary hearing to inmates in state prison or in county jail before ordering them to involuntarily receive antipsychotic medication (see §§ 2602, 2603), but not for IST defendants subject to section 1370(a)(2)(B). As explained above, "[t]he primary purpose of the pretrial confinement of incompetent defendants is neither punishment nor rehabilitation, but the restoration of that specific mental state without which the criminal process cannot proceed." (*People v. G.H., supra,* 230 Cal.App.4th at p. 1560.) Further, "IST defendants' treatment must begin within a constitutionally reasonable period of time." (*Stiavetti v. Clendenin, supra,* 65 Cal.App.5th at p. 713, citing *Jackson v. Indiana* (1972) 406 U.S. 715, 738 ["a person charged by the State with a criminal with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant."].) Thus, under the law governing IST defendants, there is a need for evaluation and treatment on an expedited basis. The same need does not necessarily exist with respect to inmates in jail or prison.

As explained in the Senate Committee on Public Safety's analysis of the bill that added subparagraphs (C) and (D) to section 1370(a)(2), "mentally ill prison inmates in very different circumstances than IST defendants. Mentally ill inmates are serving sentences that may be decades long. Many suffer chronic mental illnesses that require long-term medication, even where the need for involuntary medication may arise from a crisis. In contrast, the main purpose for treating IST defendants is to restore them to competency

for trial. . . . Ideally, the defendant will be returned to competency through short-term treatment." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 366 (2011–2012 Reg. Sess.), p. 11.)

For these reasons, we agree with the People that "the state's interests in prompt competency restoration, conserving medical resources, and avoiding undue delays justify the streamlined procedures in section 1370, subdivision (a)(2)(B). The government has a legitimate interest in providing needed treatment to IST defendants as quickly as feasible to reduce time spent in the hospital, protect their wellbeing and institutional security, and allow criminal cases to proceed. More expansive procedural requirements like a full evidentiary hearing with live testimony and cross-examination in every case would undermine these objectives and cause unjustified delay." In short, as the trial court put it, "[t]he expedited timeline of an IST commitment is a rational basis justifying [more] expedited procedures" than those provided inmates in sections 2602 and 2603.

### *Other IST Defendants*

We also discern a rational basis for the difference in treatment between IST defendants subject to section 1370(a)(2)(B) and IST defendants subject to section 1370(a)(2)(C) and (D).

The trial court summarized the difference in the procedures between the two groups as follows: "*All* IST defendants receive a hearing under § 1370(a)(2)(B); the outcome of that determination separates the two groups. Some will be found incapable of consent and qualify for IVM orders under the conditions specified; the others will not have IVM orders issued, either because the court found they retained the capacity to consent to medication, medication is inappropriate, or the court was unable to reach a determination on the reports provided. Only the latter group will potentially be subject to a § 1370(a)(2)(C)-(D) hearing, and only where there has either been a change in

circumstances (such as the defendant withdrawing consent, or a change in the psychiatrist's recommendation) or the determination was too unclear to be made based on the § 1369 reports.  The additional hearing procedures under § 1370(a)(2)(C)-(D) are based on the fact that those IST defendants were already subject to a § 1370(a)(2)(B) determination, and originally found not to qualify for the IVM order . . . ."

Defendant contends "there is no reason" for the additional procedures in section 1370(a)(2)(C) and (D) "simply because the individual's mental health deteriorated, medication has become appropriate, the reports in the first hearing were inadequate, or the individual decided to withdraw consent to medication."  But the People maintain that the emergence of those different or new circumstances following the initial proceedings under section 1370(a)(2)(B) are the point—they assert that "[a]lthough section 1370, subdivision (a)(2)(C)-(D) allows for an administrative hearing followed by superior court review when an involuntary medication decision needs to be revisited, it is rational for the Legislature to reserve those additional procedures for situations where circumstances have changed and there is a specific need to reevaluate an initial determination."  We find the People have the better argument.

We thus conclude the Legislature had a rational basis for the difference in hearing procedures between IST defendants subject to section 1370(a)(2)(B) on one hand, and inmates subject to sections 2602 and 2603 and IST defendants subject to section 1370(a)(2)(C) and (D) on the other hand.

For all of the above reasons, defendant has failed to demonstrate an equal protection violation.

**Assuming There Was Error, Reversal Is Not Required**

But even assuming for argument's sake that the trial court erred in denying defendant an evidentiary hearing, we would conclude any such error was harmless.

Preliminarily, we consider defendant's argument that the error was "structural" and thus reversible per se. "The [United States Supreme Court] repeatedly has emphasized that most errors implicating a federal constitutional right . . . are amenable to harmless error analysis and that only a 'very limited class of cases' are subject to per se reversal." (*People v. Aranda* (2012) 55 Cal.4th 342, 363.) "Most errors . . . are ' "trial error[s]," ' occurring 'during the presentation of the case to the jury.' [Citation.] They are amenable to harmless error review because they can be 'quantitatively assessed in the context of other evidence presented in order to determine whether [their] admission was harmless beyond a reasonable doubt.' [citation.] 'Structural defects,' on the other hand, 'defy analysis by "harmless-error" standards' [citation] because they are not 'simply an error in the trial process,' but rather an error 'affecting the framework within which the trial proceeds' " (*ibid.*)—for example, "a biased judge, total absence of counsel, the failure of a jury to reach any verdict on an essential element." (*People v. Gamache* (2010) 48 Cal.4th 347, 396.) "A structural error requires per se reversal because it cannot be fairly determined how a trial would have been resolved if the grave error had not occurred." (*People v. Anzalone* (2013) 56 Cal.4th 545, 553.)

In light of these principles, we are not persuaded that the asserted error here was structural. The trial court denied defendant's request for an evidentiary hearing at which he could cross-examine the competency evaluator. This error is analogous to a Confrontation Clause violation or the denial of a defendant's opportunity to impeach a witness, which errors are

38

subject to harmless error analysis. (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1281, citing *Delaware v. Vans Arsdall* (1986) 475 U.S. 673, 684; see also *People v. Greenberger* (1997) 58 Cal.App.4th 298, 350 ["If it is determined that trial court rulings limiting cross-examination of a witness have denied the defendant his right of confrontation, the error is subject to harmless-error analysis"]; accord, *People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335, 395.) Moreover, on the record before us, it can "be fairly determined" how the competency proceedings would have been resolved if the error had not occurred. (*People v. Anzalone, supra*, 56 Cal.4th at p. 554.) Therefore, we evaluate whether the error committed in the present case was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Allen* (2008) 44 Cal.4th 843, 871–872.)

According to defendant, the error here was not harmless because cross-examination of [REDACTED] "would have clarified" certain aspects of [REDACTED] report. He asserts [REDACTED]. Defendant is mistaken.

[REDACTED]

[REDACTED]

Defendant next argues that "[c]ross-examination would have been critical in determining the factual basis for [REDACTED] opinions, particularly which ones were based on personal knowledge and which ones were based on the hearsay statements made by third-parties." This argument lacks merit. [REDACTED]

Defendant also relies on the trial court's comment that " 'this is a harder question than most of these cases for me' " to argue that "the issue was a close call" and therefore that the error was not harmless. It is true, as defendant notes, that cases in which the evidence on the particular issue was lose may weigh in favor of a finding that the error was prejudicial. (See, e.g.,

*People v. Zemavasky* (1942) 20 Cal.2d 56, 62 ["An appellate court is not only permitted to, but must, consider the state of the evidence in determining whether errors are prejudicial. In a close case, such as this, any error of a substantial nature may require a reversal and any doubt as to its prejudicial character should be resolved in favor of the appellant."].) But his reliance on this principle is misplaced.

The court's remark was not addressed to the weight of the evidence. When read in context, it appears that the court was initially struggling with how to properly frame the legal inquiry before it, in light of the fact that defendant was "saying now that he consents" to antipsychotic medication. Following further arguments from counsel, the trial court took the matter under submission. Its subsequent written order, however, reflects that it ultimately determined the proper legal inquiry. In that order, the court made findings under section 1370(a)(2)(B)(I) and (II), noting it was doing so regardless of whether defendant was consenting to such medication. This analysis was correct as a matter of law. Under the statute, the trial court was required to first determine defendant's capacity to make decisions about antipsychotic medication; if the court determined that defendant did have such capacity, then it would hear from defendant, with the advice of counsel, as to whether he consented to antipsychotic medication. (See §§ 1370(a)(2)(B), 1370(a)(2)(B)(iv).) Thus, this is not the situation presented in *People v. Zemavasky, supra,* 20 Cal.3d 56, in which the evidence was "close," such that prejudice should be resolved in defendant's favor.

[REDACTED] Thus, defendant fails to show how he would have obtained a more favorable outcome had the court granted his request for an evidentiary hearing. In sum, we conclude that any error in the denial of an evidentiary hearing was harmless beyond a reasonable doubt.

**DISPOSITION**

The August 13, 2024 order committing defendant to the Department and authorizing the involuntary administration of antipsychotic medication is affirmed.

_____

RICHMAN, J.

We concur.

_____

STEWART, P.J.

_____

DESAUTELS, J.

(A171414P)

*PUBLIC- REDACTED*

Contra Costa County Superior Court

Hon. Julia Campins

Counsel:

Maria Leftwich, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Catherine A. Rivlin and Matthew J. Eitelberg, Deputy Attorneys General for Plaintiff and Respondent.